# WILLIAM CAPP et al. v. CITY OF ST. LOUIS, Appellant.

### In Banc, June 28, 1913.

1. **PARKS: Safety.** Public parks are principally maintained for the safety, recreation and amusement of the children of the toiling masses, in order that such children may have a safe and healthful resting place, morally and physically, while their parents toil for a livelihood; and they must be kept reasonably safe for immature, unprotected and indiscreet children.

2. ————: ————: Sewer Outlet: Drowning of Children: **Turn-Table Doctrine.** The turn-table doctrine has no application to a drowning case where there was a large creek or small river running through a very large city park, in which children through the summer months were in the habit of wading, and into which creek or river a large storm sewer emptied, digging out a deep and wide and unguarded hole and pool, with stone steps leading down to it and into which a child fell and was drowned—the difference being that the child was not a trespasser, as in turn-table cases, but the injury occurred where the child had a right to be.

3. ————: ————: ————: ————: **Negligence Question for Jury.** The maintenance in a public park of an unguarded pool, ten or twelve feet deep and sixty wide, calculated to attract children into a danger which they cannot appreciate, is such negligence on the part of the city in a suit by the parents of a child drowned therein as authorizes the submission to the jury of the question of whether the city exercised ordinary care for the safety of the child. The city owned a large public park, which thousands of persons, and especially children, visited daily; a large creek ran through the park, uncovered and uninclosed its entire length, and in it children were in the habit of wading, playing and fishing, especially in summer months; a large storm sewer emptied into this creek, and at its mouth there was a pool of water from eight to twelve feet deep at its center and sixty wide, caused by the water of the sewer digging out a hole in the bed of the river; stone steps led down to the water on each side of the sewer's mouth; the pool had existed for years, was unguarded, and could have been guarded at a small cost, and plaintiffs' child was found drowned in the pool on July 10th. *Held*, that the court properly submitted to the jury the question of the city's negligence.

4. ————: ————: ————: ————: **Conjecture.** The amount of water in the creek, into which the storm sewer emptied, in its ordinary and usual stages was very small, varying in depth from a few inches to fifteen inches in its deepest places, for a distance of one thousand feet above and below the pool of water, sixty feet wide and from eight to twelve feet deep at its center, at the outlet of the sewer, in which the body of the child was found on July 15th. The last seen of the child prior to that date was on July 10th, when he and the other boy of about the same age, whose body was also found in the pool, were wading in the creek about one hundred feet above the pool. When his body was discovered his pantaloons were rolled up as far as they could be, and there was some evidence that the sleeves of his shirt were likewise rolled up. *Held*, sufficient evidence to sustain a verdict that the child was drowned in the pool.

5. ————: ————: ————: ————: **Presumptions: Ordinary Care: Assassination.** The presumption is that the child was exercising ordinary care at the time he was drowned; also, that he was not assassinated, for the law never presumes that a crime has been committed.

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm,* Judge.

AFFIRMED.

*Lambert E. Walther* and *William E. Baird* for appellant.

(1) The court erred in refusing to instruct the jury at the close of all the evidence that the plaintiffs were not entitled to recover; and this because: (a) There was not one scintilla of evidence as to how the boy came to be in the pool. (b) Because in thus submitting the case to the jury, the jury were permitted to speculate as to the manner in which the boy came to be in the pool. (2) It is a well-settled rule that if an injury may have resulted from more than one cause, for one of which and not the other, the defendant is liable, it must be shown with reasonable certainty that the cause for which the defendant may be liable produced the result, and if the evidence leaves it to conjecture, the question cannot be submitted to the jury. Warner v. Railroad, 178 Mo. 125; Epperson v. Telegraph Co., 155 Mo. 346; Smith v. Bank, 99 Mass. 605; Searles v. Railroad, 101 N. Y. 661.

*Taylor R. Young* and *Willard R. Guest* for respondents.

(1) The appellant owed respondents the duty to exercise ordinary care, in the maintenance of Forest Park, to keep it free from the nuisance complained of. Carey v. Kansas City, 187 Mo. 715; Barthold v. Philadelphia, 154 Pa. St. 109; Indianapolis v. Emmelman,

108 Ind. 530; Price v. Water Co., 58 Kan. 551; Mc-Mahon v. Pekin, 154 Ill. 141; Stout v. Railroad, 17 Wall. 661.; Edmondson v. Moberly, 98 Mo. 523; Lowe v. Salt Lake City, 44 Pac. 1050; Schmidt v. Distg. Co., 90 Mo. 294; Straub v. St. Louis, 175 Mo. 413; Williams, Municipal Liability for Tort, sec. 184. (2) The evidence was sufficient to go to the jury on the question, whether the deceased met his death by being drowned in the pool at the mouth of the sewer, by falling off the stone steps. Appellant admits in its answer the death of deceased was caused by drowning. The presumption is in favor of respondents that the deceased was exercising ordinary care for his own safety at the time he met his death. As the water became gradually deeper on either side of the pool up and down the River Des Peres and being at least six feet deep immediately off the stone steps, it will be presumed, until the contrary is shown (and that burden was on appellant) that deceased would not have deliberately waded beyond his depth, but rather fell off the steps and was drowned while playing thereon with his companion Ulrich, who was at the same time also drowned in the same pool. Buesching v. Gaslight Co., 73 Mo. 233; Lancaster v. Ins. Co., 62 Mo. 121; Weighman v. Railroad, 223 Mo. 718; McGahan v. Transit Co., 201 Mo. 507; Ekhard v. Transit Co., 190 Mo. 613. Even if this were not the law, appellant would still be liable according to its own theory, as the testimony shows the water above and below this pool for a distance of over 1000 feet was only from one foot to fifteen inches in depth; defendant having admitted in its answer deceased was drowned while wading in the River Des Peres. Indianapolis v. Emmelman, 108 Ind. 530; Pekin v. McMahon, 154 Ill. 141; Linnberg v. Rock Island, 157 Ill. App. 527.

WOODSON, J.—The plaintiffs brought this suit in the circuit court of the city of St. Louis, against the

defendant, to recover the sum of $10,000 damages sustained by them, on account of the death of their minor son, Cecil Capp, caused by the alleged negligence of the city in not properly guarding a pool of water (which will be presently described) in Forest Park, in which the deceased fell and was drowned.

A trial was had before the court and a jury, and after hearing the evidence and the instructions of the court, the jury found the issues for the plaintiffs and assessed their damages at $2500. Upon the verdict of the jury, the court rendered judgment for the plaintiffs and after taking the proper preliminary steps therefor, the defendant duly appealed the cause to this court.

No question is raised as to the sufficiency of the pleadings, and we will, therefore, pass them by.

The facts are practically undisputed, and are as follows:

The plaintiffs were husband and wife and the deceased was their lawful son. The city of St. Louis is a municipal corporation organized and existing under the laws of the State of Missouri, known as the "Scheme and Charter." Forest Park is a public park belonging to, and was under the management and control of the city.

Through the park ran a small stream of water known as the "River Des Peres." Many years prior to the happening of this unfortunate incident, the city constructed what is known in the record as "Euclid Avenue Storm Sewer," which drained a large part of the city of St. Louis, as well as a considerable part of the territory of St. Louis county, and emptied into the River Des Peres at a point in the park where the deceased was drowned.

The park was large, having an area of more than fourteen hundred acres, and said river, in its ordinary stages, was insignificant, no larger than an ordinary creek, but in times of storm the waters thereof, ac-

companied with those of said sewer, became and was a mighty torrent, swift, turbulent and terrible in its flow to the Meremac and to the "Father of Waters."

At the junction of said sewer with said river, the waters of the former, in full flow, had, many years prior to the accident, washed out the bed of the river and thereby caused to exist therein an excavation about sixty feet in diameter and of a depth varying from a few inches, at the outer margin, to some ten or twelve feet in the center, which for years had been filled with water and refuse from said sewer and river.

At the junction of the river and the sewer, the outlet thereof is about ten feet in breadth and fourteen in height, with perpendicular walls constructed of stone, with caprocks on top, which are about eighteen inches higher than the adjacent surface of the ground.

Immediately adjacent to the mouth of the sewer, there are four stone steps, twelve feet long and six inches thick, leading therefrom down to the water, two of which are generally covered with the water of the pool and the other two are above the water line.

The River Des Peres is wholly unguarded in its entire length, as it passes through the park; and boys and children, with the knowledge, if not the acquiescense, of the city, have been in the constant habit of wading in the bed of said river, from early spring until late fall, and to skate thereon in the winter time.

The park is one of the great public resorts of the world, constantly frequented by many men, women and children. The World's Fair was held therein in 1904, which was visited by millions of people, and it has continued to be the greatest public resort of the city ever since. It is highly improved, carefully attended and cared for, constantly guarded and policed, by and at great cost to the city.

Some two hundred feet from the mouth of the sewer, there is a fine spring, and a path leading therefrom, to the Lindell Boulevard and Kingshighway en-

trances to the park, passes within a few feet of the mouth of said sewer. This was the most frequented part of the park.

The last time the deceased was seen alive was July 10, 1908, when he and another boy named Ulrich, about the same age, were seen by a mounted policeman named Hutton, wading in said river about one hundred feet above said pool. On or about the 12th day of July, the body of Ulrich was discovered floating in said pond, and when the father of Cecil Capp heard of that fact, knowing that the deceased and Ulrich left home together, he began to search the pond for his son, with the result that on the 15th of July he found the body of his son therein. Both of them had been drowned.

When discovered, the pants of the deceased were rolled up as far as they could be, and there was some evidence which tended to show that the sleeves of his shirt were likewise rolled up.

The evidence also showed that boys and children generally were in the habit of wading in said river, and were in the habit of fishing for crawfish therein, and playing in and about the mouth of the sewer and on the steps mentioned.

Such additional facts as may be necessary for a proper disposition of the case will be considered in the course of the opinion.

I. The city assigns but two errors in its brief, but discussed a third in the oral argument of the case in this court, namely, that there was no evidence of negligence on the part of the city in keeping, managing and controlling the park. We will consider this question first, but preliminary thereto it should be borne in mind that the public parks of the cities, while designated for the use of all classes, nevertheless, it is common knowledge, are in fact more generally ·used

Parks: Exposed Water Hole: Liability of City.

and occupied by the middle and poorer classes of our citizens who have not the means to justify them in going to the mountains, the sea shore or foreign countries for rest and recreation, as is the custom and practice of the wealthy and more fortunate class.

During the open and warm seasons of the year the parks are usually filled with the women and minor children of the poor, and especially the latter, who are usually sent there alone for safety, recreation and amusement, while their parents are down town earning their bread by the sweat of their faces. One of the most important, if not the principal quality or beneficial element of a public park, is the safety it throws around the unprotected youth and indiscreet of the State, placed therein by their toiling parents, chiefly for the safeguards supposed to be thrown around them and incidentally for play and recreation, while they, the parents, earn a living for themselves and children. Were it not for the supposed safety of the parks, the poor of the cities would be compelled to either personally guard their minor children, which would materially impair their earning power, or they would have to turn their children loose upon the public streets of the city, where they would be constantly liable to come in contact with the numerous vices and dangerous agencies ever present therein.

It is largely for this protection of life and limb, and the separation of the youth of the country from vice and dangers, that these parks are created and maintained, at such enormous cost and expense to the cities and people of the State, without which they would be absolutely worthless.

That being unquestionably true, the public parks of the cities should be maintained in a reasonably safe condition for those who frequent and use them, and especially for the unprotected youth.

The evidence is undisputed that the city of St. Louis created and maintains this inexcusable nuisance,

which is a constant menace to the lives of the children who visit Forest Park. Common sense and common experience teach us that this inexcusable nuisance can be abated at a trifling expense to the city, probably at a sum not to exceed one-half of the cost of defending this suit; and why should it not be done? It has already claimed for its vicious reward the lives of two bright and innocent boys, who were as sweet, near and dear to their parents as our children are to us. But no, echoes the city, through the voice and pen of her able and worthy city counselor, I will maintain this horrible nuisance, right in the heart of the principal play-ground of the children of the metropolis of this State, which is giving forth its offensive odors, and sickly and deadly germs, every day and night of its existence, to say nothing of its every-yawning mouth, every ready to swallow up the body of any and all children who may happen perchance to play thereat, or who may wade into its unknown depth, but well-known filth and slime.

And in this connection it might be said that much confusion has been injected into this class of cases by applying to it the doctrine applicable to the "turn-table" cases. That rule has no application whatever to this case, or to the class to which it belongs.

In this class, the injury occurred and of necessity must occur at a place where the injured party had both the legal and moral right to be, while in the turn-table cases the injury occurred and of necessity must have occurred on private property, a place where the injured person had no legal right to be, but was induced to go by an attractive piece of machinery or other matters equally attractive to children.

The confusion mentioned grows out of the fact that there is another class of cases akindred to this, where the injury occurs upon private property, namely, in the reservoirs of waterworks of the municipalities

of the country or in other private ponds and pools of water. In those cases the injured child is concededly a trespasser, but is attracted there by the water of the reservoir, pool or pond which the owner knows will instinctively attract children; and in some of the States, even in the latter class, the injured party or his representative is permitted to recover, while in others that right is denied.

The authorities supporting the latter class are cited as authorities in the class to which the case at bar belongs, for the reason that if a recovery can be had in the former, where the injured party is a trespasser, then *a fortiori* a recovery should be had in this, the latter, where the injured party had a lawful right to be.

In this case, the son of the plaintiffs lost his life in a pool of water, located in a public park, a place where the child had the right to be; but the record fails to show that either the boy or his parents had any knowledge of the depth of the pool.

So in the consideration of this case, care should be taken so as not to confuse the principles of law governing it with those controlling the turn-table cases, for the obvious reason that one might be entitled to a recovery in this class and not in that.

Returning to the contention of counsel, previously stated, namely, that the record contains no evidence of negligence on the part of the city, the uncontradicted evidence shows that Forest Park was a public resort for men, women and children, and that thousands visited it daily, and especially children, boys and girls; also that they were in the habit of wading, playing and fishing in said river, and playing on and about the steps at the mouth of the sewer, where there was a pool of water from eight to twelve feet deep in the center. This pool was caused by the waters of the stream flowing down and over the steps mentioned, and washing the dirt and soil from the bed of the river,

thereby making an excavation therein which filled up with the waters thereof.

This pool had existed for years, and unquestion- ably the city had knowledge of its existence, while the evidence shows it could have been filled up or guarded at a very small cost.

The park being a public place, and containing this unguarded pool of water, and frequented at the invita- tion of the city, by many children, young and indiscreet, who we all know are greatly attracted by pools of water, bubbling brooks and running streams, made the situation highly attractive and dangerous to any and all children who might approach the place and play in or about the stream and pool.

That evidence, in my opinion, was sufficient to warrant the court in submitting to the jury the ques- tion, whether or not said conduct of the city was such as an ordinarily prudent person would have done un- der similar circumstances. If it was, then the city was not liable for the damages done; if, upon the con- trary, it was not, then the city was liable.

That was a question of fact which the trial court, in my opinion, properly submitted to the jury, which, I believe, is supported by the following authorities: Williams, Municipal Liability for Tort, sec. 184; Carey v. Kansas City, 187 Mo. 715; Barthold v. Philadelphia, 154 Pa. St. 109; City of Indianapolis v. Emmelman, 108 Ind. 530; City of Pekin v. McMahon, 154 Ill. 141; Price v. Water Co., 58 Kan. 551; Stout v. Railroad, 17 Wall. 657; Edmondson v. City of Moberly, 98 Mo. 523; Lowe v. Salt Lake City, 13 Utah, 91; Schmidt v. Kansas City Distilling Co., 90 Mo. 1. c. 294; Straub v. City of St. Louis, 175 Mo. 413.

In the case of Carey v. Kansas City, supra, the city owned and converted a part of a block of ground, on which was located its water reservoir, into a pub- lic park, and on a level with the coping of the reser- voir wall, the city built a walk or parkway, and on the

outer edge of the coping, it built a wire fence four
and a half feet high. While the eleven-year-old son
of the plaintiffs was playing in and about the premises,
he fell into the reservoir and was drowned.

This court, in a unanimous opinion written by
Fox, J., held that the care required of the city was
that care which an ordinarily prudent person would
have exercised under similar circumstances. But un-
der the facts of that case, the court further held, and
properly so, that the city was under no legal obligation
to construct a fence around the reservoir which would
be impossible for boys to climb over, but only such a
fence as would prevent children who had reasonable
respect for the wishes of the owner of the property
from trespassing upon it.

That case clearly holds, and properly so, that the
law imposes upon Kansas City the imperative duty of
keeping the public parks thereof in a reasonably safe
condition for persons using the same for pleasure,
amusement or recreation, and especially for children
while engaged in their innocent sports, plays and re-
creations.

In the case of Barthold, the Supreme Court of
Pennsylvania tersely stated the law and facts as fol-
lows:

"Turning therefore to the evidence we find it was
shown that the pool or well in which the plaintiff's
son lost his life was upon ground acquired by the city
some six months before the accident, for the purpose of
adding it to Fairmount Park. It was not only upon
the public grounds but was open of access to persons
of all ages. The wall that inclosed it was lower than
the surrounding surface. The plaintiff's son came to
the pool to wash his shoes and sat down upon a stone,
which was part of or was lying upon this wall. The
stone tipped under his weight and he fell backward
into the water and was drowned. The stone on which
he sat fell at the same time into the pool. Whether it

was the exercise of proper care on the part of the city to leave this pool for six months in the condition described, open to the access of children, in the public grounds, was not a question of law, but of fact, and properly submitted to the jury. We have nothing to do with the correctness of their finding.''

There is no difference whatever in principle between that case and the case at bar; the facts, however, in this case show far more culpability on the part of the officers and agents of the city of St. Louis, than those did on the part of the officers of Philadelphia.

In the case of City of Indianapolis v. Emmelman, supra, the petition charged that the city, while constructing a bridge in one of the streets thereof, made an excavation in the bed of a small stream where it crossed said street; also constructed a levee from the bank of the stream to said excavation or pit, and knowing that the children of persons residing near there, were in the habit of playing in the absence of the workmen, without safeguards of any kind, and in consequence thereof the child of the defendant (in error) without negligence on his part, while at play, fell into the pit and was drowned, etc. The city demurred to the petition, for the reason that it did not state facts sufficient to constitute a cause of action against it, which was by the trial court overruled. Thereafter, the city carried the case to the Supreme Court of Indiana on writ of error (I suppose, though the report says appeal) and the court in sustaining the rulings of the trial court used this language:

''The initial proposition upon which the appellant rests its argument against the sufficiency of the complaint is, that it does not appear from the facts averred that the city was guilty of any breach of duty, in respect to the plaintiff or his child. That the liability of the city can only be affirmed upon the theory that it has violated its duty in the premises, is too clear for serious controversy.

"Speaking upon the subject as applied to an adult, this court, in the case of Evansville, etc., Railroad Co. v. Griffin, 100 Ind. 221 (50 Am. R. 783), used the following language: 'Before it can be affirmed. that the appellant was negligent,"with respect to the transaction concerning which its omission is imputed to it as wrongful, it must appear that it was under some legal duty or obligation to the plaintiff, at the time when and place where the injury occurred, which was left undischarged. If it is liable at all, this is the foundation upon which its liability rests.' [Lary v. Cleveland, etc., Railroad Co. 78 Ind. 323, 41 Am. R. 572.]

"In respect to cases such as we are considering, a learned author says: 'It is important to bear in mind, in actions for injuries to children, a very simple and fundamental fact, which in this class of cases is sometimes strangely lost sight of, viz., that no action arises without a breach of duty.' [2 Thomp. Neg., p. 1183, note.]

"With this rule in view, and with the further concession that in dealing with cases which involve injuries to children, courts and juries have sometimes strangely confounded legal obligation with sentiments that are independent of law, it must nevertheless be kept in mind that wherever an adult may be without incurring the imputation of being an intruder, a child may also go free from the like imputation. The same circumstances which would justify a recovery by one who had reached years of discretion, and had sustained an injury from the act of another, while free from fault, would justify a recovery by an infant of such years as to be incapable of fault, provided its parents or guardian were also guilty of no neglect which could be imputed to the child. And so conversely, except when a child is seen in time so that injury to it might be avoided, persons who are lawfully using, or carrying on business on their own premises, are not liable

for injuries to children, unless under the same circumstances they would have been liable to others who were equally free from fault.

"The conclusion to be drawn from the approved cases on the subject is, that the owner of premises, who has neither expressly nor impliedly invited the public to come upon or pass over his grounds, is under no legal obligation to keep them free from pitfalls, or in a condition of safety, for those who in the pursuit of their own pleasure or convenience pass over such premises, even though it be with the acquiescence of the owner. Persons passing over premises of that description exercise the privilege with its attending perils, and this without distinction as to whether or not they have arrived at an age of discretion.

"Unless contrivances are placed on such premises, with an actual or constructive intent to hurt intruders, the proprietor is not liable for injuries resulting to persons, by reason of the condition in which the premises have been left, or from the prosecution of a business thereon, in which the owner had a right to engage. [Evansville, etc., Railroad Co. v. Griffin, 100 Ind. 221, 225, and cases cited; Gillespie v. McGowan, 100 Pa. St. 144; Gramlich v. Wurst, 86 Pa. St. 74 (27 Am. R. 684); Cauley v. Pittsburg, etc., Railroad Co., 95 Pa. St. 398 (40 Am. R. 664); McAlpin v. Powell, 70 N. Y. 126 (26 Am. R. 555); Hargreaves v. Deacon, 25 Mich. 1; Burdick v. Cheadle, 26 Ohio St. 393 (20 Am. R. 767).]

"The foregoing and many other analogous cases, which might be cited, proceed upon the theory that the person sought to be held liable, had done nothing to produce injury to others who voluntarily strayed upon or invaded the premises on which the injury occurred.

"In all such cases the owner may dig an excavation in his own land, not substantially adjoining a public highway, and no action lies against him by one who has fallen into the excavation. [Hardcastle v. South

Yorkshire R. W. Co., 4 Hurlst. & Nor. 67; Hounsell
v. Smyth, 29 L. J. 203 (7 C. B. N. S. 731); Pittsburgh,
etc., R. W. Co. v. Bingham, 29 Ohio St. 364 (23 Am. R.
751); Sweeny v. Old Colony, etc., R. R. Co., 10 Allen,
368; Knight v. Abert, 6 Pa. St. 472; Nicholson v. Erie
Railway Co., 41 N. Y. 525.]

"But there is a clear distinction between the cases
cited and the case where an excavation is made in or so
near a highway as that one, while rightfully using the
highway, may, without fault, sustain injury by falling
into the excavation. Not less clear is the distinction
between a case in which an excavation is made, or
something calculated to amuse or attract children is
done or left, at a place where the child has a right to
be, and one in which the same thing is done at a place
where, in order to reach the place of danger, the child
becomes an intruder upon the premises of another.

"Whoever while passing along, or when properly
in a public street, suffers an injury, while exercising
the degree of care which the law requires of such per-
sons, by falling into an excavation which has been
made in or near such street, is entitled to maintain
an action for such injury against the person making
the excavation. In such a case, the person making
the excavation comes under an obligation to make it
safe in respect to all persons who have a right to use
the street.

"Streets are open to persons of all ages, and chil-
dren are and must be permitted to some extent at least,
to go upon the streets of towns and cities, without
incurring the imputation of negligence upon them-
selves or their parents. It would be intolerable to
hold as a matter of law, that a parent, having no knowl-
edge of the presence or probability of danger, was
nevertheless guilty of negligence in permitting a five-
year-old child to pass beyond the door yard into the
street without an attendant. Whoever, therefore, does
anything in, or immediately adjacent to, a public

street, calculated to attract children of the vicinity into danger, which they cannot appreciate, owes the duty of protecting them by suitably guarding the source of danger, or in case this is impracticable, by giving timely warning to their parents and' guardians of the existence of the danger. [City of Chicago v. Hesing, 83 Ill. 204 (25 Am. R. 378); City of Chicago v. Major, 18 Ill. 349; Niblett v. Nashville, 12 Heisk. 684 (27 Am. R. 755); Graves v. Thomas, 95 Ind. 361 (48 Am. R. 727); McAlpin v. Powell, supra; Beck v. Carter, 68 N. Y. 283 (23 Am: R. 175); 2 Dillon, Mun. Corp., sec. 1005.]

"The right of a child to go or be in or upon a street is in no way dependent upon the occupation or pecuniary condition of its parents. [Mayhew v. Burns, 103 Ind. 328.]

"If a person of discretion, while attempting to pass over the stream in question, where it crossed Spruce street, had fallen into the pit into which the child fell, no doubt could be entertained that such person, if free from contributory fault, might have recovered for an injury sustained, or if the plaintiff, without knowledge of the pit, had permitted his horse to go there for water, and it had fallen into the unguarded hole and had been injured, the liability of the city would have been beyond question.

"As we have seen, the liability of the city is precisely the same in case a child, rightfully in a street, sustains injury from a defect created therein by the city, as in the case of an adult, who is injured while free from fault, from a like cause.

"It would shock all sense of justice to hold that a city might dig a pit in a street and leave it so that children might be lured into it, and yet deny to parents, who were without fault, any remedy for the loss of a child.

"Considered in the light of what has been said, it

seems clear to us that the demurrer to the complaint was properly overruled.

"The excavation into which the appellee's son fell was made in Spruce street, at a point where it crosses Pleasant Run. It was made in the bed of a shallow stream, and left alone unguarded on a July day, with knowledge that children were accustomed to play in the vicinity. The city must be held to know that children are attracted to such a place in July weather. They were not intruders. It was gross carelessness on the part of the city, with such knowledge, to leave an unguarded pit filled with water, in the street, into which an unsuspecting child might fall."

The same law that requires a municipal corporation to keep its streets free from nuisances, and reasonably safe for those who lawfully use them, also imposes upon it the duty to keep its public parks and other public places in a reasonably safe condition for all who lawfully frequent and use them.

The case of Price v. Water Co., 58 Kan. 551, is very interesting, able and instructive. While the defendant in that case was a private corporation and the accident occurred on private property, nevertheless, it is a strong authority in support of the defendant's liability in the case at bar. In fact, the reason is all the stronger for holding a public or municipal corporation liable for the death of a person occurring on public grounds, than it is for holding a private corporation responsible therefor when occurring on private property.

The opinion was written by Chief Justice Doster, conceded to be one of the ablest jurists of the country; the facts and the law applicable thereto were stated in the following language:

"Melrose H. Price, the son of plaintiffs in error, a bright, intelligent boy of about eleven years of age, was drowned in one of the reservoirs of the defendant in error. These reservoirs were two in number, and

were situated in or near the corporate limits of the
city of Atchison, in immediate proximity to a section
of the residence portion of the city. They were of
unequal size; one having a capacity of about 1,100,000
gallons, the other, about 3,000,000 gallons. The small-
er one was used as a 'settling basin,' into which the
water was pumped, and from whence it was discharged
into the larger one through a pipe. The opening of
this pipe into the larger basin was covered with an
'apron' made of lumber, and designed to break the
force of the water discharge and prevent injury to the
walls of the reservoir. It was partially buoyed by
the water, and rose and fell as the water supply in-
creased or lessened. For four feet from the top the
walls of the smaller reservoir were perpendicular, and
thence slanted to the bottom; and its basin was about
ten feet in depth in the deepest part. The walls of the
larger reservoir slanted at an angle of about forty-
five degrees, and its basin had a depth in its lowest
part of about fifteen feet. It would be difficult, if not
impossible, for a person falling into the larger basin
to get out unaided, on account of the steepness of the
walls. These reservoirs and appurtenant grounds oc-
cupied about three acres, and were attractive places
for children, many of whom frequented there for fish-
ing and for other sports. They were inclosed with a
barb-wire fence ten to twelve wires high. There were
two gates through the fence, which, however, were
always kept closed, and two rudely constructed con-
trivances designed for stiles, but being, as described
by some of the witnesses, 'sheds,' or large boxes,
nailed to adjacent trees and inclosing most of the
wires, but upon and over which it was not difficult for
boys to climb from the outside. A watchman and cus-
todian of these grounds was employed by the defend-
ant. He was aware of the habit of the boys of the town
to climb over the stiles, *and permitted them to do so
without objection.* The boy, Melrose, without the con-

sent or knowledge of his parents, went with some companions to the reservoirs in question to fish and play, and, venturing upon the apron before described, for the purpose of crossing from one part of the reservoir wall to another, the end which projected out upon the water tank, precipitating him into the basin, where he drowned.

"Immediately upon starting to go upon the apron, one of his companions called to him and warned him of the danger of so going, saying to him he might fall in. To this he replied 'Oh, no!' His parents had frequently warned him of the danger of going to the reservoir, and he had trespassed there but once before, and then without their knowledge.

"The plaintiffs in error sued to recover damages for the loss of their son, occasioned by the negligent maintenance of the reservoir and the negligence of the defendant in permitting him access to the dangerous situation described. The above statement summarizes the evidence for the plaintiff. To this evidence a demurrer for insufficiency to prove a cause of action was sustained. This action of the court is alleged as error, and is brought here for review.

"The contention arising upon the above state of facts divides itself into two principal questions: First, Was the defendant in error negligent, as to the deceased boy, in maintaining the dangerous reservoir? and, second, Was the deceased guilty of contributory negligence in venturing upon the slanting wall and projecting apron? These are questions of fact, and they should have been left to the jury for determination. They are not questions of law for decision by the court.

"It is, however, contended by the defendant in error that, inasmuch as the deceased was a trespasser upon its grounds, it owed to him no duty to guard against the accident which occurred. Without doubt, the common law exempts the owner of private grounds

from obligation to keep them in a safe condition for
the benefit of trespassers, idlers, bare licensees or
others who go upon them, not by invitation, express
or implied, but for pleasure or through curiosity.
[Cooley on Torts (2 Ed.), 718; 1 Thompson on Negligence; 303; Dobbins v. M. K. & T. Railway Co., 41 S.
W. 62.] The common law, however, does not permit
the owner of private grounds to keep thereon allurements to the natural instincts of human or animal kind,
without taking reasonable precautions to insure the
safety of such as may be thereby attracted to his premises. To maintain upon one's property enticements to
the ignorant or unwary, is tantamount to an invitation to visit, and to inspect and enjoy; and in such
cases the obligation to endeavor to protect from the
dangers of the seductive instrument or place follows
as justly as though the invitation had been express.
The rule collected out of the authorities is vigorously,
but not too strongly, stated in 1 Thompson on Negligence, 304, 305:

" 'There is also a class of cases which hold proprietors liable for injuries resulting to children although trespassing at the time, where, from the peculiar nature and open and exposed position of the
dangerous defect or agent, the owner should reasonably anticipate such an injury to flow therefrom as
actually happened. In such case, the question of negligence is for the jury. It would be a barbarous rule
of law that would make the owner of land liable for
setting a trap thereon, baited with meat, so that his
neighbor's dog, attracted by his natural instincts,
might run into it and be killed; and which would exempt him from liability for the consequences of leaving exposed and unguarded on his land a dangerous
machine, so that his neighbor's child, attracted to it
and tempted to intermeddle with it by instincts equally
strong, might thereby be killed or maimed for life.
Such is not the law.'

"The principle involved is the same as that upon which those actions known as the 'turn-table cases' have been resolved, and in which it has been held, with few exceptions, that the maintenance, in an unguarded manner, of a dangerous apparatus for the shifting of locomotives, attractive to children residing or accustomed to playing near by, constitutes negligence upon the part of the companies. In one of these cases, it was quite well remarked by Mr. Justice VALENTINE:

" 'Everybody knowing the nature and instincts common to all boys, must act accordingly. No person has a right to leave, even on his own land, dangerous machinery calculated to attract and entice boys to it, there to be injured, unless he first take proper steps to guard against all danger; and any person who does thus leave dangerous machinery exposed, without first providing against all danger, is guilty of negligence. It is a violation of the beneficent maxim, *Sic utere tuo ut alienum non laedas*. It is true that the boys in such cases are technically trespassers. But even trespassers have rights which cannot be ignored, as numerous cases which we might cite would show.' [Kan. Cent. Railroad Co. v. Fitzsimmons, 22 Kan. 691.]

"The reasons upon which these cases proceed, and the authorities supporting the rule, are strongly set forth in Keffe v. The M. & St. Paul Railroad Co., 21 Minn. 207. They are, in brief, that where a person maintains upon his premises anything dangerous to life or limb and of a nature to invite the intrusion of children, he owes them a duty of precaution against harm, and is liable to them for injury from that thing, even though their own act, if not negligent, puts in operation its hurtful agency. One may not bait his premises with some dangerous instrument or quality, alluring to the incautious or vagrant, and then deny responsibility for the consequences of following the natural instincts of curiosity or amusement aroused thereby, without taking reasonable precautions to

guard against the accidents liable to ensue. Rights can only be enjoyed subject to those limitations which regard for the weakness and deficiencies of others dictate to be humane and just. This rule has been applied, not only in the 'turn-table cases,' but to others in which dangerous situations have been negligently maintained, and especially to cases of death or injury by falling into unguarded pools or vats of water. [Brinkley Car Co. v. Cooper, 60 Ark. 545; City of Pekin v. McMahon, 154 Ill. 141.]

- "Counsel for defendant in error endeavors to distinguish the 'turn-table' and other like cases from the one under discussion, upon the ground that, in such first-mentioned cases, the dangerous instruments or places were not inclosed, so as to exclude or warn trespassers, while in the present case, the reservoirs had been so fenced as to render access to them difficult, to say the least, and in any event to operate as notice to stay on the outside because of the dangerous situation within. Whatever merit such precautionary measures might have under other circumstances, it is sufficient to say that, in this case, they were not reasonably effective; because it was the daily habit of trespassing boys to mount the fence and frequent the reservoirs on the inside, and this habit was known to the company's responsible agent, *and was not only tolerated but went unrebuked by him.* Knowing the fence to be ineffective either as barrier or warning, it was the duty of the company to expel the intruders, or adopt other measures to avoid accident. Whatever advantages the defendant in error might have gained from the erection of a reasonably effective barrier or warning, is neutralized *by the facts of its knowledge that the boys did trespass, and its permission to them to do so.* It is as though no fence at all had been erected."

In the case at bar, the deceased child, in addition to having been attracted to the stream and pool, in

which he was drowned, by his strong boyish instincts to play, wade, paddle and fish in the waters thereof, and all other children of the city, and adults for that matter, were invited upon the premises to indulge without restraint those childish desires, unprotected from the great dangers incident to their very existence.

The case of the City of Pekin v. McMahon, 154 Ill. 141, was a suit by the parents of a child, eight years old, to recover damages for his death, caused by the alleged negligence of the city, in maintaining a deep pit on lots belonging to it, filled with water, and only partially fenced, into which he fell, while playing about it, and was drowned. The Supreme Court of Illinois, in passing upon that question used this language:

"The general rule is well settled, that the private owner or occupant of land is under no obligations to strangers to place guards around excavations upon his land. The law does not require him to keep his premises in safe condition for the benefit of trespassers, or those who come upon them without invitation either express or implied, and merely to seek their own pleasure or gratify their own curiosity. [1 Thompson on Neg., p. 303; 2 Shear. & Red. on Neg. (4 Ed.), sec. 715.] An exception, however, to this general rule exists in favor of children. Although a child of tender years, who meets with an injury upon the premises of a private owner, may be a technical trespasser; yet the owner may be liable, if the things causing the injury have been left exposed and unguarded, and are of such a character as to be an attraction to the child, appealing to his childish curiosity and instincts. Unguarded premises, which are thus supplied with dangerous attractions, are regarded as holding out implied invitations to such children. 'The owner of land, where children are allowed or accustomed to play, particularly if it is unfenced, must use ordinary care to keep it in safe condition; for they being with-

out judgment and likely to be drawn by childish curiosity into places of danger, are not to be classed with trespassers, idlers and mere licensees.' [2 Shear. & Red. on Neg. (4 Ed.), sec. 705; 4 Am. & Eng. Ency. Law, p. 53, and cases in note.] In such case, the owner should reasonably anticipate the injury which has happened. [1 Thompson on Neg., p. 304.]

"There is conflict in the decisions upon this subject, some courts holding in favor of the liability of the private owner, and others ruling against it. Where the land of·a private owner is in a thickly settled city, adjacent to a public street or alley, and he has upon it, or suffers to be upon it, dangerous machinery or a dangerous pit or pond of water, or any other dangerous agency, at a point thereon near such public street or alley, of such a character as to be attractive to children of tender years incapable of exercising ordinary care, and he is aware or has notice of its attractions for children of that class, we think that he is under obligations to use reasonable care to protect them from injury when coming upon said premises, even though they may be technical trespassers. To charge him with such an obligation under such circumstances is merely to apply the well-known maxim, *Sic utere tuo ut alienum non laedas*. It is true, as a general rule, that a party guilty of negligence is not liable if he does not owe the duty which he has neglected to the person claiming damages. [Williams v. C. & A. R. R. Co., 135 Ill. 491.] But, though the private owner may owe no duty to an adult under the facts stated, the cases, known as the 'turn-table' cases, hold that such duty is due from him to a child of tender years.

"The leading one of the turn-table cases is Railroad Co. v. Stout, 17 Wall. 657; there the company was held liable in an action by a child about six years old, who had injured his foot while playing with a turntable belonging to a company, although it was contend-

ed, that he was a trespasser, and had received the injury because of his own negligence, and that the company owed him no duty; it appearing that the turn-table was located upon the private grounds of the company in a settlement of from 100 to 150 persons, about eighty rods from the depot, near two travelled roads, and was a dangerous machine, and was not guarded or fastened, and that a servant of the company had previously seen boys playing there and had forbidden them to do so; and it was further held, that the care and caution required of a child is according to his maturity and capacity and is to be determined by the circumstances of each case; that the fact of the child being a technical trespasser made no difference in his right of recovery; that the question of the defendant's negligence was one for the jury to determine; and that the jury were justified in believing, that children would probably resort to the turn-table, and that the defendant should have anticipated their resort to it, from the fact that several boys were at play there when the accident occurred, and had played there on other occasions within the observation and to the knowledge of defendant's employees.

"To the same effect are the following cases: Keffe v. Mil. & St. Paul Railroad Co., 21 Minn. 207; K. C. Railroad Co. v. Fitzsimmons, 22 Kan. 686; Koons v. St. L. & I. M. R. R., 65 Mo. 592; U. P. Railroad Co. v. Dunden, 37 Kan. 1; Evansich v. G., C. & S. F. Railroad Co., 57 Tex. 123; Ferguson v. C. & R. Railroad, 75 Ga. 637, 77 Ga. 102; St. L., V. & T. H. Railroad Co. v. Bell, 81 Ill. 76.

"In many if not all of the foregoing 'turn-table' cases, stress is laid upon the facts, that the turn-table was in a public or open and frequented place; that it was dangerous, and left unfastened, and, when in motion, was attractive to children by reason of their love of motion 'by other means than their own locomotion;' and that the servants of the railroad companies knew,

or had reason to believe, that it was attractive to children, and that children were in the habit of playing on or about it. The doctrine of the cases is, that the child cannot be regarded as a voluntary trespasser, because he is induced to come upon the turn-table by the defendant's own conduct. 'What an express invitation would be to an adult, the temptation of an attractive play-thing is to a child of tender years.' [Keffe v. Mil. & St. Paul Railroad Co., supra; U. S. Y. & T. Co. v. Rourke, 10 Bradw. 474.]

"We are unable to see any substantial difference between the turn-table cases, and the case at bar. Here was a half block of ground in a populous city, bounded on two sides by public streets and on the third side by a public alley; with an opening of some forty feet in the fence upon the street on the south side, and an opening of equal dimensions in the fence upon the alley on the north side; with a causeway running from one opening to the other diagonally across the premises, inviting approach and actually used for passage by men and teams. Upon this half block was a dangerous pond or pit, in which the water was always five or six feet deep, and sometimes fourteen feet deep. Logs and timbers floated about in this pond; and boys had for some time been in the habit of playing upon them in the water. The city authorities had been notified of its attractiveness to children, and of its dangerous character. They not only suffered the pond to remain undrained, but the fences around it to be broken down in some places and to be actually removed in others. The deceased boy, Frank McMahon, is proven to have entered the premises at the opening in the fence on the alley. This opening was only seventeen feet from the barn of Soady, where he dismounted from the wagon on which he had been riding. The place where he was seen playing in the water was only a few feet from this opening on the public alley. The love of motion, which attracts a

child to play upon a revolving turn-table, will also attract him to experiment with a floating plank or log which he finds in a pond within his easy reach.

"The doctrine of the 'turn-table' cases is sustained by other cases where the injuries complained of were caused by agencies of a different character. Such are Mackey v. City of Vicksburg, 64 Miss. 777; Birge v. Gardiner, 19 Conn. 507; Daley v. N. & W. Railroad Co., 26 Conn. 591; Bransom v. Labrot, 81 Ky. 638; Powers v. Harlow, 53 Mich. 507; Hydraulic Works Co. v. Orr, 83 Pa. St. 332; Whirley v. Whiteman, 1 Head. (Tenn.) 610."

The other cases cited announce the same rule of law, and no special good would be accomplished by making further quotations from them.

As previously stated, we are firmly of the opinion that the evidence was sufficient to make a case for the jury; and we are, therefore, of the opinion that the court properly submitted the question of the city's negligence to the jury.

II. Counsel for the city next insist that the trial court should have sustained the demurrer to the evidence for the reason that there was no evidence introduced which tended to show the deceased child was drowned in the pool of water complained of.

**Park: Water Pool: Drowning: Inference.**

This insistence is wholly untenable, for the reason that it is not denied, but practically conceded by counsel, that the child was drowned; but be that true or not, the evidence is conclusive that he was in fact drowned; but notwithstanding that fact, counsel insist that the deceased may have drowned in the stream of water, above the pool and his body may have been washed into it, where it was subsequently found.

There is not a particle of evidence preserved in this record upon which to predicate such an assumption. In fact, all of the testimony is to the contrary.

The uncontradicted evidence was that the stream of water in the River Des Peres, in its ordinary and usual stage, was very small, varying in depth from a very few inches to fifteen inches in its deepest places, for a distance of one thousand feet above and below the pool of water in which the body was found; and there was not a particle of evidence tending to show that the stream did not remain in its ordinary and usual stage from July 10, 1908, when the boy was last seen alive, wading in the stream about one hundred feet above the pool, until a few days thereafter when his body was found.

The presumption is that he was exercising ordinary care at the time he was drowned.

[Buesching v. St. Louis Gaslight Co., 73 Mo. 219.]

Also that he was not assassinated, for the law never presumes that a crime has been committed. This is elementary.

III. It is finally insisted that the argument of **Remarks of** counsel before the jury was calculated to **Counsel.** prejudice the minds of the jury against the defendant, and was for that reason erroneous.

We have examined the record touching that matter, and have failed to find any objectional language therein, or in the suggestion that the witnesses were improperly interrogated about immaterial matters for the purpose of unduly influencing the jury.

Finding no error in the record, we are of the opinion that the judgment should be affirmed; and it is so ordered. All concur except *Lamm, C. J., Graves* and *Brown, JJ.*