[Civ. No. 946.   Fourth Appellate District.—August 8, 1933.]

J. V. CRONE, Appellant, v. CITY OF EL CAJON (a Body
Politic and Corporate) et al., Respondents.

J. J. Barrett and Fred A. Steiner for Appellant.

Philip Storer Thatcher, J. A. Isaacson and Lester J. Penry for Respondents.

MARKS, J.—This is an appeal from a judgment notwithstanding the verdict entered after the jury had returned a verdict in favor of plaintiff for damages caused by the drowning of his fourteen year old son in a municipally owned swimming pool. Motions for nonsuit and an instructed verdict were regularly made by defendants.

The allegations of the pleadings before us show that the action as originally brought included the members of the city council of the City of El Cajon as defendants and sought to recover judgment against them under the provisions of section 1 of an act of the legislature approved June 13, 1923 (Stats. 1923, p. 675), which for want of a better name we will refer to as the Municipal Liability Act. No evidence was offered under this phase of the case and the

action against the members of the city council was abated. Recovery against the municipality was sought under the provisions of section 2 of this act.

The evidence disclosed that for several years prior to 1930 respondent had operated a swimming pool during the summer months for the pleasure of its citizens. Small fees for its use were charged, but their total did not pay the cost of its operation. During the summer of 1930 the pool had been in operation for a little more than four weeks prior to July 3d, the date of the drowning which gave rise to this action.

A permit was issued by the California state board of health, which provided that the pool might be operated "subject to the regulations of said Board and subject to the following provisions: (1) The water to be emptied when the bottom at the deep end is no longer clearly visible. . . ." The regulations of the board contained the following: "All water in the pool shall at times of use be bright and clear, so that the bottom of the pool may be plainly visible."

The water for the pool was supplied from the same pipes that furnished domestic water for the citizens of El Cajon. This water carried silt which collected on the bottom of the pool when it was not in use. Bathers would disturb this deposit, discoloring the water. It was the custom of the municipality to have the pool drained and cleaned each Monday. The discoloration of the water increased as the week progressed. According to one witness the water was so discolored on ten or twelve occasions in 1930 between the opening of the pool early in June and July 3d that the bottom was not visible in the deeper portions. On July 3d, which fell on Thursday, the bottom was not visible beyond a depth of between four and five feet.

The city employed one lifeguard, who was also a caretaker and ticket seller. During the hours the pool was in use, when not engaged in selling tickets, he acted as lifeguard. He occasionally had volunteers helping him. During the later hours of each day less of his time was spent in selling tickets than during the earlier hours. The shallower parts of the pool were separated from the deeper by a rope for the protection of children and bathers who could not swim. Each foot of variation in the depth of the pool was marked with figures between six and eight inches in height along its

side. The pool was built of cement and was forty feet wide and sixty feet long. Its shallowest depth was two feet with the bottom descending for fifty-one feet four inches to an extreme depth of nine feet.

At about 2:30 o'clock on the afternoon of July 3, 1930, two sons of appellant, Emmitt, aged fourteen years and thirty-three days, and Truman, aged eighteen, went to the pool, each paying ten cents for admission. After donning their bathing suits they entered the water. Truman, who was a good swimmer, went to the deep end of the pool, spending his time diving from the springboard and swimming. Emmitt, who could not swim, entered the shallow water and spent some time playing with the smaller children. There were a number of persons in the pool, estimated as high as forty, some of whom were excellent swimmers and who spent their time diving and swimming in the deep water. Twice during the afternoon Truman saw Emmitt hanging on the side of the pool over the deep water and sent him back to the shallow end. Emmitt had worked along the edge holding on to the splash rail with his body hanging in the water. At about 4 o'clock a diver touched a body on the bottom of the deep part of the pool. It was brought to the surface and found to be Emmitt. No one knew the length of time it had been there or how it had gotten there. The evidence indicates that for some time before 4 o'clock the lifeguard had been on duty as such around the pool.

The pool was under the supervision of a committee consisting of a member of the city council and the marshal. There is no evidence that either of these officers, or any other officer of the city, had been to the pool since its opening early in June, or on July 3d, or had any notice, knowledge or information of the muddy condition of the water on the ten or twelve occasions mentioned in the record, or at any other time, or of any other condition at the pool which might render its condition defective or dangerous, except that the members of the city council all knew that but one lifeguard was employed there.

The rule is well established that a judgment notwithstanding the verdict should be entered only when an instructed verdict would have been proper, and not in a case where there is any substantial, competent and material evidence supporting the cause of the party in whose favor the

verdict is returned. For this reason we have summarized the evidence most favorable to appellant, although but few conflicts appear.

Sixteen special issues were submitted to the jury and answers to thirteen were returned, in addition to a general verdict. The answers to the thirteen issues were such that it was unnecessary to answer the other three. These special findings were responsive to issues raised by either the pleadings or evidence and may be thus summarized: That the construction of the pool with a sloping bottom did not make it unsafe or dangerous to bathers and was not the cause of its being slippery; that the mud or silt on the bottom of the pool made it slippery and dangerous for bathers, but that Emmitt Crone did not slip on the floor because of this condition; that the water in the pool was not bright and clear and this condition contributed to the death of Emmitt; that at the time Emmitt became submerged there was not a sufficient number of lifeguards to keep the pool safe for bathers and that this contributed to Emmitt's death; that the pool lacked certain life-saving equipment, but that this did not contribute to Emmitt's death; that Emmitt was not guilty of contributory negligence; and, that the only dangerous or defective condition of the swimming pool of which respondents had any notice or knowledge was that there were insufficient attendants at the ''pool adequate for lifeguard purposes to keep the pool and premises safe for bathers''.

We have studied the record carefully and under the evidence the only special finding upon which the jury could have reached a contrary finding was the one which found Emmitt free from contributory negligence. The evidence would support the inference, had it been made by the jury, that for a third time Emmitt worked along the edge of the pool to the deep water and slipped to his death. ''It would not conform to the dictates of common reason to say that a child of the age of eight years, or even younger, does not know and fully realize that a fall into a pond of water or a deep reservoir would result in injury to him, if not in his death.'' (*Polk* v. *Laurel Hill Cemetery Assn.*, 37 Cal. App. 624 [174 Pac. 414, 418]. See, also, *Beeson* v. *City of Los Angeles*, 115 Cal. App. 122 [300 Pac. 993].)

Appellant urges that because the City of El Cajon charged an admission fee to the swimming pool it ceased to

act in a governmental capacity and operated it as a private function in a proprietary capacity and that it was liable for ordinary negligence without regard to the provisions of the Municipal Liability Act. The facts of the instant case square with those of *Kellar* v. *City of Los Angeles*, 179 Cal. 605 [178 Pac. 505], where a similar contention was decided adversely to the plaintiff. Under this authority we must hold that the City of El Cajon was exercising a governmental function and acting in a governmental capacity in operating the swimming pool in its public park.

The elements which must exist in order to support a recovery under the provisions of section 2 of this act are stated in *Pittam* v. *City of Riverside*, 128 Cal. App. 57 [16 Pac. (2d) 768, 769], as follows: "(1) The injuries to respondent (plaintiff) . . . must have resulted from a dangerous or defective condition of the dumping ground; (2) the city council of the City of Riverside, or some officer or person having authority to remedy such condition, must have had notice or knowledge thereof; (3) it, or he, must have failed or neglected to remedy such dangerous or defective condition within a reasonable time after acquiring such knowledge or receiving such notice; or, (4) must have failed to take such action as might be reasonably necessary to protect the public against such dangerous or defective condition within a reasonable time after such knowledge or notice."

We have concluded, under the facts here presented, i. e., the muddied condition of the water on certain days when the pool was in operation, the cleaning and refilling each Monday with water fairly clear, but which grew darker as the week progressed, that there is no showing of a long-continued neglect of an existing condition that would constitute notice under the rule laid down in *Boyce* v. *San Diego High School District*, 215 Cal. 293 [10 Pac. (2d) 62], and other similar authorities.

It is clear from the evidence that the failure to maintain more than one lifeguard at the swimming pool was the only possible lack of due care that might be relied upon by appellant, if this could be regarded a lack of due care, that was brought to the notice of the members of the council or some officer or agent of the City of El Cajon having the authority to remedy such a condition. This limits appellant's right of recovery to this one possible ground. We do

not need to decide whether the failure to employ more than one lifeguard might have amounted to ordinary negligence in the operation of the swimming pool, which would create no liability; or, whether a dangerous or defective condition of public property would be created by operating it in accordance with a general scheme put into effect by the municipal authorities and in such a manner that a dangerous and defective condition would be created and allowed to exist, under which circumstances there might be a liability. (*Pittam* v. *City of Riverside, supra*.)

The evidence must show some causal connection between the death of Emmitt and the fact that but one lifeguard was stationed at the pool. In order to permit a recovery the failure to have more than one lifeguard must have been the proximate cause of the death. In this we disregard any question of contributory negligence.

■ The lifeguard was probably around the pool at the time Emmitt disappeared beneath the water. Emmitt's own brother was swimming there. A number of youths, all expert swimmers, were in the pool and over the spot where the body was found. None of them, nor any of the many bathers in the pool, saw Emmitt sink or had any idea he was missing until about the time his body was found. The City of El Cajon was not required to insure the safety of the bathers in its pool, nor can a lifeguard guarantee that no bather will drown in the water he is patrolling. The city was only required to furnish a pool that was not in a dangerous or defective condition. Would two lifeguards have prevented the tragedy? If ten lifeguards had been employed would any one of them have been more likely to have seen the boy sink into the water than the considerable number of bathers who were swimming and diving near the spot where he must have disappeared? Under the facts before us we cannot conclude that the failure to have more than one lifeguard was the proximate cause of Emmitt's drowning.

The case of *Bertalot* v. *Kinnare*, 72 Ill. App. 52, presents facts almost identical with those of the instant case except that there the swimming pool was privately owned. It was there said: "It is doubtless the law that the proprietor of such an institution would be liable for injury to a patron, if such injury resulted from lack of ordinary care in providing for his safety, and without fault of the patron; but it is as

surely not the law that such proprietor is in any sense an insurer of the safety of his patrons, nor would the death of a patron within his premises cast upon the proprietor the burden of excusing himself from any presumption of negligence. (*Brotherton* v. *Manhattan B. I. Co.*, 48 Neb. 567 [67 N. W. 479, 58 Am. St. Rep. 709, 33 L. R. A. 598].)

"It was incumbent upon defendant in error, as plaintiff in the trial court, to sustain his declaration with evidence, and to establish the averments of some one of its counts. The question here presented is simply whether the record shows evidence which would warrant the jury in finding that there was such lack of ordinary care as is alleged, and that it was the proximate cause of the death of the intestate.

"Defendant in error presented no evidence to show just how the lad came to his death, except that some ten or fifteen minutes after he was seen alive and in a place of safety, he was found unconscious, and, it may be, already dead, at the bottom of the swimming tank. . . . A verdict for plaintiff in error (the pool owner) would have been warranted had the jury given credit to the testimony of his witnesses. The verdict for defendant in error was bad, because unsupported by any evidence whatever as to how the intestate happened to meet the disaster which resulted in his death, and what negligence, if any there was, contributed thereto, or was the proximate cause thereof. The verdicts, general and special, could have been based upon nothing but guesswork. Whether the jury guessed that the accident was caused by a slippery floor (not averred but proved), lack of railing (not averred as to the south end), a crowded room, or by simply getting beyond depth in efforts to learn to swim, and negligent omission by attendants to effect rescue, is immaterial. Certain it is that from the evidence it cannot be found that any one of these things had aught to do with the accident, and it is certain, too, that the evidence warrants no conclusion of any negligence after the boy was found in the water; and if negligence was assumed after the discovery of the body, it could not be determined that such negligence had any bearing upon the lad's death in the absence of any evidence as to how long he had been beneath the water before discovery. Neither does it profit to inquire as to any negligence claimed to have been shown on the part of plaintiff in error or his attendants before the discovery of the body,

for it cannot be determined from this record whether such negligence, if any there was, caused the result of the boy's death.

"In *Brotherton* v. *Manhattan B. I. Co.*, *supra*, the court says: 'How Brotherton got back into the deep water and what occurred there is not revealed by any evidence. It is not sufficient to establish a case for the plaintiff that negligence should be proved on the part of the defendant, but it must also appear that the negligence proved was the proximate cause of the injury.' This is a statement of a familiar proposition of law, but it bears particularly upon the case under consideration by reason of similarity of facts.

"Because of the insufficiency of the evidence to sustain the declaration, the verdict should have been set aside and a new trial granted."

Judgment affirmed.

Barnard, P. J., and Jennings, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on October 6, 1933.