MAX O. BAGBY, an Infant, by His Next Friend, R. O. BAGBY, v. KANSAS CITY, a Municipal Corporation, Appellant.—92 S. W. (2d) 142.

Division Two, March 21, 1936.

*George Kingsley, James R. Sullivan* and *Arthur R. Wolfe* for appellant.

*Cowgill & Popham, John F. Cook* and *Johnson, Garnett & Quinn* for respondent.

WESTHUES, C.—Max O. Bagby, a minor, obtained a judgment in the sum of $20,000 against Kansas City, Missouri, a Municipal Corporation. From this judgment the city appealed. Respondent was injured while he and other boys were playing on the side of a rock cliff in Spring Valley Park, which park was maintained by the city. A rock, weighing about one hundred and fifty pounds, became loosened and rolled down the cliff striking respondent and crushing his arm to such an extent that amputation became necessary. The case was submitted to a jury upon two allegations of negligence. By Instruction 1 the case was submitted to a jury on the theory that if the city knew, or by the exercise of ordinary care could have known, that rocks in the

side of the cliff were loose and likely to fall and the city could have, by the exercise of ordinary care, remedied the situation then the city was liable in damages to respondent if he was injured through the neglect of the city in not removing or securely fastening the loose rock. By Instruction No. 3 the case was submitted to the jury on the theory that if the city knew, or by the exercise of ordinary care could have known, of the dangerous condition and did not post warning signs advising the public of the danger then the city was liable in damages to respondent if the failure to warn constituted negligence and as a result respondent was injured.

The principal point relied upon for a reversal of the judgment is, that the trial court should have sustained a demurrer at the close of all the evidence as requested by appellant. ■ It is hornbook law that in determining the question of whether the trial court should have directed a verdict for appellant we must view the evidence in its most favorable light to respondent. With this principle of law in mind let us examine the evidence and determine if the ultimate facts proven are sufficient to make a case against the city.

The accident occurred in the extreme northeast portion of Spring Valley Park where a rock cliff is located. Respondent lived southwest of the park. On the morning of March 22, 1930, respondent, Max O. Bagby. about ten and one-half years of age; a younger brother, Jack Bagby; George Patterson and Edward Hoffman, the latter two each about ten or eleven years of age, went to the park to play. They entered the park at the southwest corner and immediately proceeded to the northeast portion and the rock bluff for the avowed purpose of playing a game known as "Follow-The-Leader." This game, as explained by witnesses, is played in somewhat the following manner: One person is selected as a leader. This leader performs feats that the others are to imitate. Respondent testified that the main idea was for the leader to perform acts which the others were also to perform, and if those following missed or failed to do what the leader had done then such one failing was to go to the end of the line. Other witnesses testified the main purpose was for the leader to perform daring stunts which required skill, those following to perform the same stunts or fail. If the writer's memory serves him correctly (and it has not been many years since he played the game) the latter explanation is the most accurate. Evidence in this case conclusively shows that performing feats which required nerve and skill was the main purpose of the game being played on this day. The boys all testified that they crossed the park and went to the rock bluff and there began the game. From photographs in the record and from the evidence we learn that this ledge of rock, bluff, cliff, or hill, whatever it may be called, it was given all those names by the witnesses, is and

was in its natural state. It is several city blocks in length and in places more than twenty feet high. Various kinds of trees of considerable size adorn the cliff. These trees are mostly along the lower and upper edges although some are located along the side of the bluff where it is not too steep and where sufficient earth is found for trees to take root. In a number of places the ledge consists of a steep natural rock wall, barren of vegetation. To the southwest the ground is level and here are located baseball diamonds and tennis courts to be used by the public. The park does not extend beyond the ledge to the northeast. The photographs show that a street parallels the bluff at the upper edge. The photographs also plainly show a fence along the upper side, between the street and the bluff, consisting of iron posts and wire netting about six feet in height. It was disclosed by the evidence that the purpose of the fence was to keep the public away from the bluffs and from descending the bluff to enter the park. There are a few paths leading up the bluff where the slope permits, but no paths run along the side thereof in the direction in which the boys were going, and it is plain to see that the topography of the ground renders such paths an impossibility. The boys testified that they reached the bluff near the center, where the tennis court was located, climbed about one-half way up and proceeded to scale along the side of the cliff toward the ball park. As the boys scaled along the bluff they reached the point where the rock in question was located. Respondent testified that as he was walking along a path a falling rock struck him and knocked him down the bluff, crushing his arm. On cross-examination he testified as follows:

"Q. Now, as you went along, you took ahold of the rocks to balance yourself along on that part of the bluff? A. Yes.

"Q. And to keep yourself from falling down to the bottom? A. I didn't need to; I didn't have to.

"Q. Well, but you did take ahold of them, didn't you? A. Yes.

"Q. And you took ahold of one of these rocks and it came loose and knocked you off of the bluff, is that it? A. Yes.

"Q. Had the other boys gone along that same path? A. Yes.

"Q. Hoffman and Patterson? A. Yes."

Respondent was also examined with reference to testimony given at a deposition. Note the following:

"Q. Well, now you said in your deposition, let's refer to it again, 'Question: Well, why did you have hold of the rock? Answer: To hold myself on.' Is that correct, Max? A. I don't remember whether it is or not. As I remember, I just took hold of it to balance myself.

"Q. Another question, 'Question: I see. And when you had hold of it there with your two hands, it came loose, is that right?' A. I didn't have ahold of it with both hands.

"Q. 'Answer: Yes.' You answered that question that way, didn't you? 'Question: And when you had hold of it there with your two hands, it came loose, is that right? Answer: Yes. Question: And you are positive about that? Answer: Yes.' Did you make those answers, Max, when this deposition was given? A. Yes."

George Patterson, a witness for plaintiff, on cross-examination testified as follows:

"Q. Oh, yes. Could you tell after you saw Max down there on the ground, hurt, from what place this rock had fallen? A. Yes, sir; the dirt was sort of fresh where it pulled out. It looked like it might have pulled out the side of the bank.

"Q. Where it pulled out. You went along that same place, whether you had gone around that same rock or not? A. Well, we either climbed over it or jumped on it. I have forgotten just which.

"Q. You either climbed over it or jumped on it, you say? A. Yes, sir.

"Q. It was a place where the cliff was very steep, wasn't it, and you had to get around the rock either by climbing around it or jumping over the top of it? A. It was—well, it was sort of steep.

"Q. Well, you couldn't get around it by just walking past it. You had to either scale your way around it or climb over the top of it? A. Oh, walk over on top of it; yes, sir.

"Q. Yes, and you came in contact with the rock either by taking ahold of it and scaling your way around or by jumping on top of it, is that it? A. Well, you could climb over it.

"Q. Yes, climb over it; and did you climb over it, do you know? A. Well, I don't know just exactly what we did do. Ed—Edward thinks that we climbed over it and that is—we might have did that.

"Q. You either climbed over it or you took ahold of it and scaled your way around it, one or the other, didn't you? A. Yes, either one of the two."

Edward Hoffman, a witness for plaintiff, testified on cross-examination as follows:

"Q. Now, those rocks some places you had to jump from rock to rock to get along, didn't you? A. Well, there was a path there that we had to catch hold of the rocks to get our balance on the path.

"Q. Well, you had to jump in some places to get from one rock to another, didn't you? A. Yes.

"Q. And then other places you had to scale your way around the rock, didn't you? A. Yes.

"Q. It was very steep along there where this boy fell, wasn't it? A. No, I don't think it was.

"Q. Well, had you been over this rock that fell? A. Yes, sir.

"Q. How did you get over it? A. I climbed over it.

"Q. Well, were you on top of the rock? A. No, we clumb over the rock.

"Q. How do you mean you climbed over it? Did you walk over it or stand on it or did you go above it or what? A. No, we walked over it.

"Q. Yes, and you and George Patterson both walked over it, did you? A. Yes, sir.

"Q. There was a part of the wall where it was too steep to jump and you had to hold to rocks above your heads to get along, didn't you? A. Yes.

"Q. When you play follow the leader, the leader is trying to do something the other fellow can't do, isn't that it? A. That is it.

"Q. And you boys were trying to do something that the boys behind you couldn't do. That was quite a feat to climb along that cliff, wasn't it, where you had sometimes to hold to rocks above your head to keep from falling? A. Sometimes it was.

"Q. What? A. Sometimes it was.

"Q. Some parts of that cliff it took some boy to do it, didn't it? A. Yes.

"MR. LANGSDALE: That is all."

Ray Hilton, another witness for plaintiff, testified that he happened to be in the park when respondent was injured; that he saw respondent and the rock fall. When asked to describe the place from which respondent fell he testified as follows:

"Q. (By MR. POPHAM): Just describe it, Mr. Hilton. Give us the facts. A. Well, I don't know whether that ledge goes all the way around or not, but there was a little bit of ledge where he was, I should say about five or six inches wide."

On cross-examination he testified that as respondent was coming around the rock that injured him he took hold of the rock and it gave way with him. He testified further, in answer to a question, as follows:

"I think they had a foot-hold all right, but wasn't much and they were holding on."

Further, on cross-examination, he testified:

"Q. Did you examine this rock that fell with the boy? A. You mean right after it?

"Q. Yes. A. Well, we looked at it. We didn't pay a whole lot of attention to it.

"Q. Did you see it any time after that? A. Yes, I have seen it several times since then.

"Q. And did the rock break off from another part of a rock or how did it come down, if you know? A. It seemed to be a rock in itself setting underneath this ledge.

"Q. Setting underneath the ledge? A. Yes.

"Q. And it pulled out? A. Yes, that is the way it looked. It was setting on a small ledge itself.

"Q. Up above where the boy's feet were? A. Yes."

This witness was also examined with reference to a written statement, made by the witness, in the form of questions and answers. It reads in part as follows:

"Q. (By MR. LANGSDALE) Now, going farther into this statement, Mr. Hilton, question and answer: 'Question: The place there was not much of a place to stand upon. You could easily slip off if you didn't have your hands upon something? Answer: Yes.' That was correct, wasn't it? A. Yes.

"Q. (Reading) 'Practically all of their weight, as you observed it there, was pulling with their hands? Answer: No, I wouldn't say it was. They were just trying to slide around there, well, without falling off and just simply had ahold with their hands to keep from falling backwards.' Is that correct? A. Yes, sir.

"Q. (Reading) 'And you saw their hands up above their heads? Answer: No, sort of had them around the rock, up around this way (indicating). Question: Like a hoop reaching around a barrel? Answer: Yes.' You made those answers? A. Yes.

"Q. 'And they were working their way around? Answer: Yes, sir. Question: I see. Was this place where these boys, and especially the Bagby boy was feeling his way around, steep or not? Answer: It was steep up but not hardly straight up perpendicular. Question: It was practically straight up though, wasn't it? Answer: Yes.' That is correct, isn't it? A. That is right.

"Q. Nothing like a hill or anything of that sort? A. No.

"Q. 'Impossible to walk up that, isn't that right? Answer: Yes.' You made that answer? A. Yes."

We think it is evident from the testimony that at the point where respondent was injured the rock cliff was at least twenty feet high, too steep to climb over, and exceedingly difficult to scale along from side to side. The city, as the evidence disclosed, constructed a fence to keep the public from taking a short cut over the cliff to and from the park. The photographs and the evidence also disclosed that the cliff was permitted to remain in its natural state as an object of beauty. It is evident that the part of the park, that is, the rock cliff, was not intended to be used as a playground. The question before us is whether, under the evidence, the city could be held liable for not removing or securing the rock in the cliff, or for failing to post warning signs. ■ In many jurisdictions municipalities are not held liable for negligence in maintaining public parks. This because the maintenance of public parks is considered a governmental function. [See cases cited in 43 C. J., p. 1172, sec. 1937.] In other jurisdictions municipalities are held liable in such cases. [43 C. J., p. 1170, sec.

1936.] Missouri is found in the latter class. [See Kuenzel v. St. Louis, 278 Mo. 277, 212 S. W. 876; Healy v. Kansas City, 277 Mo. 619, 211 S. W. 59.]

We are of the opinion that the city was not negligent in failing to post warning signs advising the public of the danger of climbing up or along the rock cliff. The rock cliff itself was notice of danger, more impressive than any warning sign that could have been placed there by the city. Any child of respondent's age would know that climbing about such rock cliffs is attended by a certain degree of danger. It was this very danger, incident to scaling along the cliff, that tempted the boys to play there, as one of the witnesses testified it took some boy to climb parts of this cliff. In Volz v. City of St. Louis, 326 Mo. 362, l. c. 367, 32 S. W. (2d) 72, l. c. 74 (5, 6) this court said:

"It results that the failure of the city to place signs in proximity to the pond, as a warning that the ice was dangerous, was not the proximate cause of Leslie's death, for warning signs could not have given the boys more knowledge than they had of the conditions confronting them."

So in this case a warning to the boys could not have been of any more benefit to respondent than a warning sign posted next to a tree giving notice that he who dares to climb may fall.

We are also of the opinion that the city was not negligent in failing to remove or secure the loose rock. The city maintained the park primarily for the pleasure of the public. It was a place of amusement and recreation. The symmetry and beauty of the scenery in a public park are of as much interest to a large portion of visitors as baseball diamonds and tennis courts are to others. The rock ledge or cliff with its trees and shrubbery, where respondent was injured, was left in its natural state because it added beauty to the scenery. The city constructed a fence of wire netting along the upper side of the ledge, where the danger of walking down the ledge was not so apparent. The rock cliff was not intended to be used as a play ground or passage way. A municipality is required, under the law, to exercise ordinary care in maintaining public parks in a reasonably safe condition. That does not mean that a city must eliminate every danger. If it did, fences could not be constructed without creating a liability. [See Brown v. City of Scranton, 313 Pa. 230, 169 Atl. 435.] Or as this court said in Volz v. City of St. Louis, 326 Mo. 362, l. c. 366, 32 S. W. (2d) 72, l. c. 73 (3, 4):

"Ordinary fences and barriers are scaled by boys notwithstanding. It would be impracticable for the city to place fences or barriers around every object or place, possibly or imaginably dangerous to youth."

It would likewise be impracticable and a heavy burden upon a municipality to keep portions of a park, not intended for a play-

ground, in a safe condition. No authority has been cited casting upon a city any such burden.

Many of the cases cited by respondent are cases where defects existed in equipment furnished by the city in public parks, or where there were defects in portions of the park where the public was expected to be. Norberg v. Hagna (S. D.), 29 A. L. R. 841, 195 N. W. 438, concerned a defective swimming pool. In Thayer v. City of St. Joseph, 227 Mo. App. 623, 54 S. W. (2d) 442, the city maintained a swimming pool for profit and the basis of recovery was negligence of a life guard. In Volz v. City of St. Louis, 326 Mo. 362, 32 S. W. (2d) 72, from which we have quoted, liability was denied where a boy fell through thin ice on a pond in a city park. It was held that the city was not negligent in failing to post danger signs or in failing to construct a fence around the pond. In Kuenzel v. St. Louis, supra, liability was based upon a failure to have a light on a dark stairway in a bathhouse. In Healy v. Kansas City, supra, liability was denied. In Carey v. Kansas City, 187 Mo. 715, 86 S. W. 438, recovery was denied where a boy, about eleven years of age, was drowned while attempting to catch frogs in a city reservoir in a public park. In Nation v. City of St. Joseph, 5 S. W. (2d) 1106, the Kansas City Court of Appeals held that where a boy was drowned in a pond in a park the city was liable in damages, on the theory that ordinary care required a city to either fence the pond or fill it with earth. The holding seems to be contrary to the holding by this court in the Volz case, supra. In the opinion of the Volz case, Capp v. St. Louis, 251 Mo. 345, 158 S. W. 616, was discussed, and we think it was correctly pointed out that liability in the Capp's case was based on the theory that the city created an entrapment in a shallow stream by discharging a large amount of surface water from a sewer which created a deep hole in the shallow stream. Davoren v. Kansas City, 308 Mo. 513, 273 S. W. 401, was also cited in the Volz opinion, and it was there stated that the city was held liable on the theory that it had unnecessarily maintained a nuisance through the construction of a dam which created a pond wherein the plaintiff's son was drowned. It may be noted, however, that in the Capp and Davoren cases, both by the court en banc, three of the judges dissented and were of the opinion that no liability existed under the facts proven in either case. None of the cases mentioned above, however, go so far as to hold that a city would be negligent in failing to remove all of the loose rock from a cliff which had been left in its natural state and was not intended to be used or adapted for a playground. Counsel cited no case that so holds and our search has failed to reveal any. If a city is to be required to remove all the loose rock from a rock cliff, then why not go a step further and require the city to remove all obstructions on rock cliffs over which boys may stumble and fall to their

injury. Apropos to the situation we quote the following from the Volz case, 326 Mo. 362, 1. c. 366, 32 S. W. (2d) 72, 1. c. 73 (3, 4):

"It may be that a pond or pool is potentially dangerous, but so a tree may be or a terrace or dry land. Parks are maintained for the recreation and refreshment of the public, and water and ponds in parks divert and refresh people. If unsightly fences and barriers are erected around waters, and any of them probably would be unsightly, the symmetry of the landscape would be marred and the recreation and refreshment of the people lessened. If it is negligence to fail to place barriers around ponds or waters into which a youth may fall and drown, why is it not negligence to fail to erect barriers to prevent children from climbing trees from which they may fall to their injury or death, or to fail to place barriers around a thorny bush or shrub against which youth may prick their flesh and thus possibly develop an infection causing death."

The removal of rock would not render a cliff, such as is here in question, safe as a playground for children. It would only remove one of the many dangers lurking there. To hold that a city was negligent in not making a rock cliff reasonably safe for a childrens' playground would mean the elimination of the cliff.

We conclude, therefore, that the evidence, when viewed in its most favorable light to respondent, falls short of justifying a verdict against the city. The judgment is reversed. *Cooley* and *Bohling, CC.*, concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.

MOTION FOR REHEARING AND TO TRANSFER TO COURT EN BANC.

PER CURIAM:—Respondent filed a motion for rehearing wherein it is contended that the opinion in this case is erroneous in holding that respondent had failed to make a case for the jury. It is charged that as to the character of the place where respondent fell and as to the knowledge of the danger, the writer of the opinion overlooked controlling evidence in the record. Upon a reconsideration of the evidence we fail to find anything to change our views. We deem it unnecessary to add anything to what was said in the opinion with reference to the place where respondent and the rock fell from the cliff. The other question, that is, the failure of the city to place warning signs advising of the danger, was disposed of rather briefly in the opinion. Warning signs only serve to notify persons of an existing danger. If the danger is known a warning sign is useless. The main opinion holds that the cliff itself was notice of danger. In addition to that let us see as to respondent's actual knowledge of the danger. We quote his testimony:

"Q. And were you watching your footing as you stepped along there to see that you didn't disturb any loose rock? A. I don't remember. I wasn't thinking about loose rock then.

"Q. When you would take ahold of a rock to go around it, did you make any effort to see whether they were loose or not? A. No.

"Q. Did you see any loose rock in the park at all? A. Yes, I saw a lot that had fallen down around the benches there.

"Q. You saw one rock, you say? A. A lot of them.

"Q. At the foot of the cliff? A. Yes.

"Q. How do you know they had fallen down? A. You could see them all around there.

"Q. And you knew that they were rock that had fallen from that cliff by where they lay then? A. Yes, and where the benches were turned over, too.

"Q. And you saw all of those before you fell, of course? A. Yes.

"Q. Because you were unconscious after you fell? A. Yes. . . .

"Q. Of course, you knew if one of those rocks came loose, you might fall and be hurt, didn't you? A. Yes.

"Q. And you knew that all those rocks at the bottom had fallen before you went up the cliff, didn't you? A. Yes.

"Q. You knew they had fallen from that cliff? A. Yes.

"Q. That is the only place they could have come from, isn't it? A. Yes.

"Q. You knew that? A. Yes."

██ It is evident from the testimony quoted that respondent knew and fully realized the danger, and therefore warning signs would have been of no benefit to him. The failure to warn had no connection with the injury respondent received. In the motion for rehearing respondent urges that he did not fall from the cliff, but that a falling rock struck him and knocked him from the cliff. This assertion is not justified by the evidence. Respondent's own evidence disclosed that as he was scaling his way around the cliff he held to rocks to keep from falling. One of the rocks came loose while respondent had hold of it and both rock and respondent fell. It is evident that the rock fell because it was pulled loose or overbalanced by the pull of respondent as he was scaling around the rock. All of the facts that we have referred to in the main opinion and in these comments were shown by evidence introduced by respondent. The motion for rehearing and the motion to transfer to court en banc are hereby overruled.