JOHN T. HECHT, Administrator, Appellant, v. DES MOINES PLAY-
GROUND AND RECREATION ASSOCIATION, Appellee.

No. 44805.

82

August 1, 1939.

Rehearing Denied November 24, 1939.

Judson E. Piper, for appellant.

Bradshaw, Fowler, Proctor & Fairgrave, for appellee.

BLISS, J.—The defendant association is a corporation, not for pecuniary profit, organized in 1918, and existing, under the provisions of chapter 2, of Title IX, of the Code of 1897, section 1642 et seq., as amended. It is eleemosynary in its nature and purposes, and was organized for the maintenance and operation of playgrounds and recreation centers in the city of Des Moines. It issued no stock, and pays no dividends. Any income, over operating expenses, has been used for recreational and charitable purposes. Its directors and other officers receive no pay for their services. Since 1922, the defendant had operated the swimming pool at Camp Dodge, under lease from the State of Iowa, the owner of the pool and grounds. During the year 1938, the operation of this pool was the only recreational activity of the defendant. Miss Kathryn Krieg, as superintendent

of recreation in the city of Des Moines, under the Department of Public Affairs, has been, in a rather ex officio capacity, the executive secretary for the defendant, although the city has had nothing to do with the operation of the swimming pool. As executive secretary she was in general charge of the operation of the association under instructions from its officers and directors. She received no compensation from the association. Those in active charge of the operation of the pool have been employed by a committee of the association. For use of the pool, there was an admission charge of twenty-five cents for adults, which included all over twelve years old, and ten cents for those who were twelve years or younger. For this charge each one was entitled to use the pool and its facilities as long, and as often, as they cared to from 10 o'clock in the morning till 10 o'clock at night.

The pool is of cement construction throughout, including the bottom, sides, and a walk completely around it. It is 350 feet long, east and west, and 150 feet wide, north and south. At the east end the depth of the water, when the pool is in use, is about 18 inches, and gradually deepens until it is 3 feet deep at a distance of 150 feet from the east end. At this point a heavy rope cable, supported on wooden, loglike floats, equally spaced, is stretched across the pool. For about 75 feet farther west the water deepens until it is 6 feet deep at that distance. At this point, another cable, as described, is stretched across. From this point the water deepens until it is 9 feet deep at the west end. In the center of the pool, north and south, and about 50 feet from the west end is a wooden raft, or rather a stationary platform, 16 by 29 feet. The entire pool is surrounded by a 5-foot wire mesh fence, with three gates in the west side of it. Cement walks lead to each gate from a large bathhouse, 81 feet west of the pool. In it were the dressing rooms, check rooms, shower baths, offices, etc. Twenty-four feet to the right of the middle gate near the edge of the west end of the pool was a wooden block. Six feet farther to the right was an elevated, canopied lifeguard stand. Five feet farther was a springboard, consisting of a heavy plank 14 feet long, anchored to the top of the end wall of the pool and the abutting concrete walk. The springboard extended at a slight upward pitch over the pool. The body of the deceased was found at the bottom of the pool, in

9 feet of water, about 5 or 10 feet beyond the end of the board. Still farther to the right of the springboard, a distance of 32 feet, and at the curved southwest corner of the pool, is a second wooden block. It was from about this point that Norman Bray, the thirteen-year-old tentmate of the deceased, let himself into the pool and swam diagonally about 75 feet to the raft. Fifty feet farther east from this block, on the south side of the pool, was a high diving tower, with diving boards or platforms at different heights. At the top of this tower were two large capital lettered, painted, four line signs: "Caution. Water 9 Ft. Use this Board at your own Risk." These signs were at right angles to the pool, with one facing east and the other west. On each side of the tower on the walk, at its bottom, was the following sign, in black paint: "9 ft." Thirty-seven feet east of this high diving tower, was an elevated lifeguard stand, and 77 feet farther east was another such stand.

Immediately across the pool from the high diving tower, just referred to, and on the north side, was a similar high diving tower. To the left of the middle entrance from the bathhouse, and twenty-seven feet north was another low diving board, then a guard stand, then another low springboard, and at the curved northwest corner of the pool was the ten-foot diving tower. The water in the pool came within about a foot of the top of the walls of the pool. On the uncovered space of the walls between the surface of the water and the top of the wall were black painted signs indicating the varying depths, foot by foot, from the shallowest depth to nine feet. On the surface of the surrounding wall or walk were similar depth signs. These signs were visible and readable to one from almost any place within or about the pool. Just above the surface of the water and all around the pool was a continuous pipe hand-hold fastened to the wall. Such were the existing conditions on July 14, 1938, when the deceased was drowned. He was then a few days less than eleven years and four months old. He had lived in Des Moines until he was about eight years old, when he went with his parents to a farm a short distance east of Des Moines, where he lived at his death. He was a strong healthy boy, slightly over five feet two inches tall. He took part in some of the farm work. His grades in school were above the average. He excelled in geography, history, art, spelling and arithmetic.

In March, 1938, he had joined the Altoona 4-H Club, which had about forty members. The organizer and leader of this particular group was Eugene Ford, a man energetic in youth activities. There were seventeen of these splendid groups in the county under the leadership of Dwight Booth. In 1937 the county membership had an outing at Camp Dodge. A similar three-day outing was begun on July 14, 1938. About one hundred members from the county attended, fourteen of whom were from the Altoona group. The deceased was of this latter group, which was in charge of Ford. Booth was in general charge at the camp. Each member paid to Booth $2.50 to cover all charges, including swimming privileges. The defendant made a group rate of ten cents to each member for daily admission to the pool. Prior to the outing, Booth had asked the defendant to furnish swimming instructors to the group, but Miss Krieg directed him to the Red Cross, which specially supplied the group with two competent swimming instructors and lifeguards. These two had acted in the same capacity at the 4-H girls' outing, the week before. Booth had arranged with these two to be on hand at 11 o'clock in the forenoon of the 14th, to give instructions to the boys before going into the water. Booth had given each boy a ticket for the pool when he registered. These tickets were distinguishable from the general tickets in use.

Mr. Kerr, a school superintendent, was in general charge of the pool for the defendant. Three lifeguards were in the regular employ of the defendant, and worked in shifts. Additional guards, up to ten, were available for Sunday and holiday crowds. On the morning in question, Burchard, a competent lifeguard, was on duty from 10 o'clock in the forenoon until 1 o'clock in the afternoon. He was seated under a large umbrella-like sun shade, just inside the fence, at the middle gate, a little less than twenty feet from the west, or deep end of the pool. He took the tickets of those entering the enclosure. Kerr knew in a general way of the arrangements which Booth had made with the two Red Cross guards. Three groups of girl scouts, with their own special instructors and lifeguards, were using the pool that morning between 10 and 11 o'clock. Two of these groups were in the shallow water, and one group was in the deep water between the raft and the west end, and in the vicinity of the low diving boards. In addition to these groups, whose num-

ber was not disclosed, were about twenty-five others using the pool. Among the latter were perhaps a half dozen 4-H boys who had entered the water before 11 o'clock. Among them also was a group of six boys and girls, under the chaperonage of one of the mothers, who had gone from the low diving board to the high diving tower on the south side. Fifteen-year-old Hugh Bottelson was in this group, and had entered the water about 10:30 o'clock.

The deceased, with his mother, an older brother, and a neighbor boy arrived at the camp about 10 o'clock. He placed his luggage in a tent with a neighbor boy, and together they went to the registration tent of Booth and paid their dues, and received tickets for the pool. They went to the bathhouse where Kerr showed them to the dressing rooms, clothes checking room, and showers. Ostberg, who was in charge of checking the baskets of clothes, said the two boys came into the bathhouse at 10:45 o'clock, and were in there five or ten minutes. He took their clothes and saw them leave the checkroom but did not see them enter the pool. Bottelson had seen them in the showers, and had helped the deceased in turning on the shower. He remembered him because he had an undershirt under his bathing suit. The bathing suit had been purchased the Saturday previous. His parents testified that he could not swim, and there was no evidence to the contrary. As a child his father had taken him wading in some of the park pools in Des Moines.

The deceased's companion, Bray, testified that he came down the walk to the middle gate, gave his ticket to Burchard at the gate and turned to his right and walked up to the second wooden block, herein referred to, a distance of seventy-two feet from the gate, and after sitting a short time on the edge, slid into the pool and swam to the raft. He then looked back and about and to the east end, but saw neither the deceased nor any one else that he knew. He did see a number of the boys from the Altoona group coming through the gate. He then swam to the shallow end of the pool and played there with a number of camp acquaintances until a Red Cross guard called them on shore for instructions. The guards then divided the group into two groups—those who could swim in one group, and those who could swim a little into another group. All of them then went into the water. He testified that the last time

he was sure that he saw the deceased was when the latter was in the dressing room. At no time did he see him in the pool.

Smith, one of the Red Cross lifeguards, had been engaged in the work of swimming instructor and lifesaver for ten years. He testified he had rescued thirty or forty drowning persons each summer. He arrived at the pool about 10:30 o'clock. With Blank, his fellow guard, he went to the middle gate about 11 o'clock and as the 4-H boys came through he sent them to the shallow end of the pool. He stayed at the gate until 11:10 o'clock, and then went to where the boys were gathered and gave them a fifteen minute talk. He did not know the deceased.

William Hitz, seventeen years old, president of the county 4-H organization, with a companion went into the deep water of the pool, at 10:30 o'clock, and after remaining fifteen or twenty minutes, they came out and sat on a table near the entrance until 11 o'clock, when they went through the gate to the pool with the rest of the group. He knew the deceased, but, never saw him at any time.

Hugh Bottelson, after diving from a low diving board a number of times, went to the top of the south high diving tower. He testified that while he was there waiting his turn, he saw Bray, in the lead, and the deceased enter the middle gate. He had no further recollection of the deceased, though he saw his companion, Bray, enter the water and swim to the raft.

Burchard, the guard and ticket taker, had no recollection of having seen the deceased at any time. Neither did he have any recollection of seeing Bray. The chaperon of the Bottelson group testified that she observed Burchard sitting with his head in his hands at times. He testified that he was attentive to the bathers at all times, and it is undisputed that from his position he had an unobstructed view of the pool, and particularly of the deep portion thereof.

No witness saw the deceased enter the pool, or saw him in the pool, or saw him sink beneath the water. So far as the record discloses no one about the pool saw or heard anything to indicate that any one was drowning or in danger of drowning. He was not missed until luncheon, when his companion, Bray, not finding him at the tent, gave the alarm. His clothes were found in his basket in the checkroom, and about 1:30 o'clock his body was found in the deep end of the pool. At-

tempts at resuscitation were unavailing. On the arrival of the coroner he diagnosed his death as asphyxiation from drowning. There was no autopsy.

The plaintiff alleged that the defendant was negligent: (1) in admitting the deceased to the pool in advance of his group, and in advance of supervision of the group by the Red Cross instructors; (2) in not advising him of the depth of the water, and in failing to inquire of him as to whether he could swim; (3) in failing to display proper placards or signs indicating the different depths in the pool; (4) in having but one lifeguard who was stationed at the west end, and who was engaged in taking tickets; (5) in the failure of the guard to observe and aid the deceased after he entered the enclosure; (6) in failing to provide sufficient guards and attendants to observe and supervise the deceased and other swimmers then in the pool and assist those in danger of drowning and injury. The petition alleged freedom from contributory negligence on the part of the deceased.

The defendant denied the allegations of the petition generally, and alleged its eleemosynary character, and the matters herein stated relative to the operation of its activities. Because of its charitable nature and that of its work, it claimed immunity, from any alleged negligence. In reply, the plaintiff denied defendant's allegations in the answer, and averred that if true, they constituted no defense.

At the close of all of the evidence the defendant moved for a directed verdict in its favor upon the grounds that no actionable negligence had been established, and that because of the eleemosynary nature of its organization and work, it was not liable for the negligence of any of its employees or agents. This motion was sustained and judgment was entered against the plaintiff for costs.

In this court the appellee urges as grounds for an affirmance, the same grounds and reasons as it alleged in its motion for a directed verdict in the court below. It is our judgment that the trial court was right in its ruling on the motion, and that its judgment should be affirmed.

I. The facts, as herein stated, are as favorable to the appellant as the record and all legitimate inferences therefrom warrant. This is a case of first impression for this court, as the

precise question presented by this record has not heretofore been before it for determination. In passing upon the contentions of the appellant, and the various allegations of negligence relied upon, and the duties and the measure of care which the appellee owed to the plaintiff's intestate, we must bear in mind that the defendant had nothing to do with the rules and regulations of the outing camp of the 4-H boys, and had no control over their conduct while in that camp. The Altoona club, of which deceased was a member, was under the direct supervision of Mr. Ford, its organizer and director. The youthful president of the county organization was in the camp. Mr. Booth, the county director of the organization, with general supervision over it, was in charge of the camp. He had arranged with the Red Cross for the presence of two of its swimming instructors and lifeguards. The defendant had nothing to do with the plans or the methods to be employed by these two men in connection with the group. They had watched over the 4-H girls in the pool the week before. While these matters would not absolve the defendant from any obligation of ordinary care to the patrons of its pool, they all have an important bearing in determining the degree of watchfulness and attention which ordinary care required under the circumstances.

Was the defendant negligent in permitting the deceased to prematurely enter the pool? First, there is no evidence that he entered the pool before 11 o'clock, or in advance of the group as a whole. Nor is there any fact established from which that particular fact might be legitimately inferred. If it could be fairly found that he did enter the pool in advance of his companions can that be said to have been negligence on the part of the defendant? Here were a hundred boys changing from street clothes to bathing suits in the dressing rooms, checking their clothes, and taking the required showers. For all of them to be ready by 11 o'clock, many had to get ready and out of the way several minutes before eleven. According to Ostberg, the checkroom attendant, the deceased left the checkroom not earlier than ten minutes before eleven. Whether he had taken his shower does not appear. The Red Cross guards were at the gate about this time. If they were not, it was not the fault of the defendant. To say that under the circumstances the defendant owed a duty to see that the deceased did not enter the pool

before the group did, or before he had received instructions from the Red Cross guards, would be requiring something more than the exercise of ordinary care.

II. Was the defendant negligent in not informing the deceased of the depth of the water in the pool? We assume that the appellant means directly and personally informing him. The appellee concedes that it gave no such personal information to him. Under some circumstances it might be negligence not to give such information, but that is not true in this case. The depth signs about the pool fully met the demands of ordinary care. The diving boards at the west end of the pool were additional warnings, in themselves, that the water was not shallow. The Bray boy saw the 9-foot sign on the high diving tower, but did not observe the other depth markings. There is no doubt of their existence. Six different pictures of the pool have been certified to this court and they clearly show the various depth signs.

Even without artificial depth notices and signs, a body of water of this type is, in itself, a warning to a boy, of the experience and education of the deceased, that it might be dangerous to one who could not swim. This court and the courts of many other jurisdictions have held that such a body of water, natural or artificial, cannot be classed with those instrumentalities described as attractive nuisances. One of the reasons given is that the dangers of such a body of water are obvious to children the age of the deceased. In Polk v. Laurel Hill Cemetery Assn., 37 Cal. App. 624, 174 P. 414, 418, an eight-year-old boy was drowned in a concrete reservoir in the cemetery, 130 feet by 55 feet and 16 feet deep. In holding there was no liability, the court said:

"A pond of water, it may be conceded is always attractive to youngsters; but the dangers connected with and inherent in a lake or pond of water, natural or artificial, are obvious to everybody—even to a child old enough to be permitted by its parents to go about and play unattended upon the streets or in the public parks. It would not conform to the dictates of common reason to say that a child of the age of eight years, or even much younger, does not know and fully realize that a fall into a pond of water or a deep reservoir would result in injury to him, if not in his death."

As stated in Peters v. Bowman, 115 Cal. 345, 349, 47 P. 113, 114, 598, 56 Am. St. Rep. 106, "the danger of drowning in it is an apparent open danger, the knowledge of which is common to all." In Bagby v. Kansas City, 338 Mo. 771, 92 S. W. 2d 142, 146, Supreme Court, Div. 2, recovery was sought for injuries to a boy, ten and a half years old, received while attempting to climb the face of a steep cliff in a park of the defendant. One ground of negligence was the failure to post warning signs. In reversing a judgment for plaintiff, the court said:

"We are of the opinion that the city was not negligent in failing to post warning signs advising the public of climbing up or along the rock cliff. The rock cliff, itself, was notice of danger, more impressive than any warning sign that could have been placed by the city. Any child of respondent's age would know that climbing about such rock cliffs is attended by a certain degree of danger."

For holdings similar to the foregoing see Crone v. City of El Cajon, et al., 133 Cal. App. 624, 24 P. 2d 846; Volz et ux. v. St. Louis, 326 Mo. 362, 32 S. W. 2d 72, Supreme Court, Div. 2. In City of Evansville v. Blue, 212 Ind. 130, 8 N. E. 2d 224, 228, in speaking of artificial and natural pools, the court said:

"Such waters embody perils, but of a nature which must be deemed obvious to children who approach them for purposes of bathing. Numerous cases upon the subject are collected in 20 R. C. L. p. 96. * * * Healthy boys of eleven years and younger must be deemed to know the perils of deep water, and it must be recognized that it is in the nature of boys to venture where it is dangerous."

We have found no decision holding that a failure to give direct, personal notice to any patron of a swimming pool or bathing beach was negligence, where there were adequate signs, notices or markings, giving general notice to all. The depth notices and markings placed by the appellee were all that reasonable and ordinary care required.

III. What we have said in the preceding division is a sufficient answer to appellant's complaint that no inquiry was made of the deceased as to whether he could swim. His age, intelligence and experience were sufficient to advise him of the

inherent dangers of entering a body of water which was deeper than his height. The markers were ample notice of the depths of the pool. He was under the supervision of adults, who had more direct and complete control over him, than the agents and employees of the appellee. Had the latter learned by inquiry from him that he could not swim, they could have given him no more complete information than was given him by the signs. With a large group of boys, the appellee used the only reasonable and adequate method of informing them of the depths in every part of the pool, and that was by placing depth markings which were visible reminders to each one at all times. Ordinary care required nothing more.

On this phase of the case the appellant cites Henroid v. Gregson Hot Springs Co., 52 Mont. 447, 158 P. 824, 825. It gives but little support to appellant's contention. A boy thirteen and a half years old was drowned in defendant's public swimming pool. There were no depth signs or similar warnings, and there was no allegation of negligence based on such absence. The allegations of negligence were that the boy was unable to swim or to take care of himself in water over three feet deep and these facts were known to the defendant, and that his death came through negligence in failing to have any person present to care for him. A nonsuit against the plaintiff was affirmed. On inquiry of an attendant the boy demonstrated his ability to swim by swimming across the pool—46 feet—and back. The court said:

"Other things being equal, the defendant would owe a higher degree of care to the boy whom it knew could not swim, and who was permitted in the pool, than to one whom it knew could swim. In other words, the ability to swim or the lack of it would be an important factor in the sum of all of the circumstances which determine what is and what is not ordinary care. We think that this is the theory upon which the complaint proceeds—the theory upon which recovery is sought— and if the evidence tended to show that this defendant knew, or by the exercise of ordinary care should have known, that Lee Henroid could not swim, it might be conceded, for the purpose of this appeal, that a *prima facie* case would be made out; but there is not any evidence that defendant knew he could not

swim, and the only knowledge brought home to it was conveyed by the exhibition of his ability to swim and his own statement.''

In Mullen v. Russworm et al., 169 Tenn. 650, 90 S. W. 2d 530, 532, plaintiff's twelve-year-old son was drowned in a swimming pool operated for profit. Conspicuous figures on the side walls showed each additional foot of depth. Deceased was in the 6th or 7th grade at school. He could not swim but could keep afloat for a short time paddling dog fashion. Judgment for the plaintiff was reversed and the suit dismissed. The defendant employed two lifeguards who were on duty. There was no proof whatever as to the circumstances attendant upon the death of the boy. The court said:

''The negligence alleged on the part of the defendant is (1) that the life guards were careless and inattentive to bathers; (2) that an insufficient number of life guards were employed about the place; and (3) *that defendants were negligent in failing to learn whether the boy could swim before admitting him to the pool and permitting him to go into deep water in the pool.* [Italics ours]. * * * In the case before us, this boy simply disappeared from sight in a pool where more than 150 people were present. None of these people witnessed his disappearance. Nobody saw him in any trouble. Nobody knows where he sank under the water. Such being the circumstances it can not be said that the presence of two or three more guards would have been of any avail. If none of the large number of people near him saw the little boy's danger, it is not likely that his danger would have been perceived by guards on the side of the pool whether their number was two or four. Plaintiff's case meets the same obstacle when we come to consider the charge of negligence in failing to ascertain whether the boy could swim before admitting him into the pool and permitting him to get into deep water. In the first place, it would be rather a strong thing to say that the proprietor of a bathing pool was negligent in permitting a boy to enter the pool until that boy could swim. If such were the rule, the ordinary boy in the cities could never learn to swim. But beyond this, there is nothing in the record to show that the inability of this young boy to swim brought about his death. He may have been seized with cramp and died in shallow water. It is a bare conjecture to say that he drowned in water over his head. The only thing that could be said to

indicate that deceased was drowned in deep water, or that the defendants permitted him to get into deep water, is the circumstance that his body was found in the east [deep] end of the pool.''

Since the pool was drained to that end to recover his body, the outflowing water might have drawn it there. What the court said there is very applicable here, and the facts were much the same. Here the body was found in deep water, but how it got there can only be conjectured. Whether he accidentally slipped or fell into the water, or whether he was stricken with cramps while on one of the ladders, or while holding to the handhold, or whether he fell from the diving board, from dizziness or otherwise, would be all mere surmises, and yet they are just as reasonable, or more so, than to guess that he deliberately entered the deep water knowing he could not swim. Any explanation of how or where he entered the pool is without proof, either direct or circumstantial, and is based on the merest guess or conjecture. We have found no decision that ordinary care requires a bathhouse proprietor to ascertain from each patron whether he can swim or not, or the extent of his swimming ability. In this particular case, and under all the circumstances attending his being there, it cannot be said that the defendant was lacking in the exercise of ordinary care, in giving notice of the various depths of the pool.

IV. The last three allegations of negligence are based upon the lack of sufficient attentive guards. The appellant failed to establish any of these allegations. And if it might be conceded that any such negligence was established, for the purpose of argument only, he failed to establish any causal connection between the negligence and the death of his intestate. The 4-H group had two competent lifeguards for their own special service, besides other adult attendants. The girl scouts also had their swimming instructors and lifeguards. There were but twenty-five bathers in the pool who were not thus attended. There is no question of the competency of defendant's lifeguard, Burchard, who never left his post at the deepwater end of the pool. There was no evidence that one guard was not enough, or that more would have prevented the decedent's drowning. He took tickets from the bathers as they entered the enclosure, but he testified that he was at all times observant of the bathers.

There were perhaps 150 bathers in the pool, many of them at the place where the body was found. It cannot be said that he was negligent in failing to see something which none of these saw. Similar allegations of negligence were made in Curcio v. City of New York, 249 App. Div. 844, 292 N. Y. S. 868; Id., 275 N. Y. 20, 9 N. E. 2d 760; Maher v. Madison Square Garden, 242 N. Y. 506, 507, 152 N. E. 403, 404; Peterson v. City of New York, 267 N. Y. 204, 206, 196 N. E. 27, 28; Flora v. Bimini Water Co., 161 Cal. 495, 119 P. 661; Swan v. Riverside Bathing Beach Co., 132 Kan. 61, 294 P. 902; Nolan v. Y. M. C. A., 123 Neb. 549, 243 N. W. 639; Lyman v. Hall, 117 Neb. 140, 219 N. W. 902; Crone v. City of El Cajon, 133 Cal. App. 624, 24 P. 2d 846. In the latter case the single lifeguard was also a ticket taker. City of Evansville v. Blue, 212 Ind. 130, 8 N. E. 2d 224. See, also, Heino v. Grand Rapids, 202 Mich. 363, 168 N. W. 512, 517, L. R. A. 1918F, 528. In all of these cases the fact that the guard gave attention to some other duties was held not to have been actionable negligence.

In Swan v. Riverside Bathing Beach Co , supra, the Kansas court said [132 Kan. 61, 294 P. 904] :

"There is no showing that the number of guards furnished was insufficient. The fact that something occurred that they did not see or hear will not establish that fact, because there were a hundred or more patrons in the pool who evidently did not see or hear anything indicating distress or danger, for we can safely reason on the humanitarian basis that they would have given an alarm if they had either seen or heard anything that indicated the need of help or assistance."

In Maher v. Madison Square Garden Corporation, supra, the highest court of New York said [242 N. Y. 506, 152 N. E. 404] :

"Though the swimming pool was crowded at the time, apparently no one saw the fatality. We know only that he was playing in the pool one afternoon, and his dead body was found in another part of the pool the next morning, and that death was caused by asphyxiation. No inference can be drawn that by act or omission of the defendant or any of its employees the boy was placed in a position of danger which caused his death

or that any greater care by the defendant could have averted the accident.''

In Bertalot v. Kinnare, 72 Ill. App. 52, that court said:

''Defendant in error presented no evidence to show just how the lad came to his death, except that some ten or fifteen minutes after he was seen alive and in a place of safety, he was found unconscious, and, it may be, already dead, at the bottom of the swimming tank.''

In Nolan v. Y. M. C. A. and Flagler, supra, the individual defendant, as scoutmaster, took his troop to the ''Y'' for a swim, and one of the troop, a boy of twelve years, was drowned. About 10 minutes after his troop of about twenty-five entered the pool, the deceased, who could not swim was noticed standing about waist deep in water. He was not seen thereafter alive. No one saw him disappear or knew when and how he got into deep water. The court said [123 Neb. 549, 243 N. W. 641]:

''No higher standard of duty is imposed on the defendant Y. M. C. A., who granted the privilege of using its pool without compensation for a laudable purpose, than upon the keepers of bathing resorts for gain. Competent guards and attendants were furnished with the approval of the Y. M. C. A. The fact that the Y. M. C. A. did not directly furnish the guards or attendants is not material nor is it evidence of negligence. There is no proof that the number of guards and attendants was insufficient. Taking into consideration the size of the pool the evidence establishes ample guards were provided. In this connection it is also urged that the guards and the defendant Flagler failed and omitted to keep a proper lookout to observe the peril in which Nolan had become involved. This contention is based upon the failure to notice the disappearance of Nolan and to miss him thereafter. Under the circumstances disclosed * * * such omission was not actionable negligence.''

In Lyman v. Hall, supra, the Nebraska court said [117 Neb. 140, 219 N. W. 904]:

''Without resorting to speculation or conjecture the jury could not properly find that, except for the failure of the guard to miss the bather and to notice that he did not promptly reappear, there would have been no loss of life.''

In Crone v. City of El Cajon, supra, the court said [133 Cal. App. 624, 24 P. 2d 848]:

"The evidence must show some causal connection between the death of Emmitt and the fact that but one lifeguard was stationed at the pool. In order to permit a recovery the failure to have more than one lifeguard must have been the proximate cause of the death. * * * A number of youths, all expert swimmers, were in the pool and over the spot where the body was found. None of them, nor any of the many bathers in the pool, saw Emmitt sink or had any idea he was missing until about the time the body was found. The City of El Cajon was not required to insure the safety of the bathers in its pool, nor can a lifeguard guarantee that no bather will drown in the water he is patrolling. * * * Would two lifeguards have prevented the tragedy? If ten lifeguards had been employed would any of them have been more likely to have seen the boy sink into the water than the considerable number of bathers who were swimming and diving near the spot where he must have disappeared? Under the facts before us we cannot conclude that the failure to have more than one lifeguard was the proximate cause of Emmitt's drowning."

Other cases where there have been similar holdings based upon like reasoning are Scott v. City of Long Beach, 109 Cal. App. 254, 292 P. 664; Phillips v. Orr, 152 N. C. 583, 67 S. E. 1064; City of Evansville v. Blue, supra; Henroid v. Gregson Hot Springs Co., 52 Mont. 447, 158 P. 824; Mayor and City Council of Baltimore v. State for the Use of Blueford, 173 Md. 267, 195 Atl. 571; where an eleven-year-old girl was drowned in a pool in a city park. See the concurring opinions.

Among the cases cited by appellant and others found in our search are Thayer v. City of St. Joseph, 227 Mo. App. 623, Kansas City Court of Appeals, 54 S. W. 2d 442; Decatur Amusement Park Co. v. Porter, 137 Ill. App. Rep. 448; Levinski v. Cooper, Tex. Civ. App., 142 S. W. 959; Brotherton v. Manhattan Beach Improvement Co., 48 Neb. 563, 67 N. W. 479, 33 L. R. A. 598, 58 Am. St. Rep. 709; City of Longmont v. Swearingen, 81 Colo. 246, 254 P. 1000; Jensen v. Kansas City, 181 Mo. App. 359, 168 S. W. 827; Larkin v. Saltair Beach Co., 30 Utah 86, 83 P. 686, 3 L. R. A., N. S., 982, 116 Am. St. Rep. 818, 8 Ann.

Cas. 977; McKinney v. Adams, 68 Fla. 208, 66 So. 988, L. R. A. 1915D, 442, Ann. Cas. 1917B, 326; Magnuson v. City of Stockton, 116 Cal. App. 532, 3 P. 2d 583; Rovegno v. San Jose Knights of Columbus Hall Assn. et al., 108 Cal. App. 591, 291 P. 848; Williams v. Delta Swimming Pool Inc., 89 Colo. 586, 5 P. 2d 583; Nordgren v. Strong, and Cullen v. Strong, 110 Conn. 593, 149 Atl. 201; Maehlman v. Reuben Realty Co., 32 Ohio App. 54, 166 N. E. 920; Lipton v. Dreamland Park Co., 121 N. J. L. 554, 3 A. 2d 571. In most of these cases we have no criticism of the decisions or the principles of law announced, but the facts in each of them make them of little application in the determination of the case before us.

■ Appellants have quoted at length from Rome v. London & Lancashire Indemnity Co. of America, La. App., 169 So. 132. In that case the defendant was the insurance carrier of a corporation operating the parks of New Orleans for the benefit of the public, as an arm of the municipal government. The Louisiana court had held that the corporation was not liable because it was exercising a governmental function, but in the above case the court held the insurance carrier could not avail itself of this exemption. The deceased was a ten-year-old boy. Although there were 300 bathers and two lifeguards there were no eyewitnesses to his drowning. There was an admission charge of 25 cents. The court said:

"Keeping in mind the burden placed upon the proprietors of the swimming pool, by virtue of their contractual undertaking, the little boy bathes in that pool and is drowned without the life guards seeing him or knowing whether or not he was in distress, notwithstanding that the portion of the pool in which he was drowned is located at a point not over 15 or 20 feet from one of the life guard stations. Under these circumstances, we are of the opinion that a presumption of negligence arises against the proprietors of the pool, in that, if the life guards had been doing their duty and had been attentive, they would have discovered the presence of the boy in peril. A presumption of fault on the part of the owner, does not arise merely because a person is drowned in his swimming pool. But where a person is drowned in a pool policed by life guards supplied by the owner under a contract with the deceased, and those guards have failed to see the drowned person in distress, either

because of the fact that the pool was overcrowded, or because they were not alert and vigilant in the exercise of their duties, then, in such case, it will be presumed that if the life guards had been attending to their task, they would have discovered the peril in time to rescue life."

We cannot follow the Louisiana court so far. Such a rule would, in practical effect, make the bathhouse proprietor an insurer of the lives of his patrons. That case was pleaded and tried on the res ipsa loquitur doctrine. We think that doctrine ought not be applied to such a case. To say that the mere fact of the drowning of a person under such circumstances, in view of the inherent dangers of a body of deep water, in itself speaks of the negligence of the proprietor, is carrying the doctrine beyond its recognized limits.

In speaking of the Louisiana case, the Indiana court in City of Evansville v. Blue, supra, said:

"The soundness of the application of the doctrine to such a situation may well be doubted. It would seem not to be sustained by the reasoning in the cases dealing with the doctrine."

In the case before us, specific grounds of negligence were alleged. It was incumbent on the appellant, to not only establish one of these grounds, but to prove that it was a proximate cause of the drowning. Negligence to be actionable must be fastened to the injury. The appellant failed to do either.

It is the general rule that the proprietor of a bathhouse or swimming pool for profit is bound to use ordinary care to guard against injury to his patrons. For the purposes of this appeal we have assumed that this was the obligation of the defendant to the deceased. Under this standard of liability it is our judgment that the appellant failed to establish his case. We therefore do not find it necessary to pass upon the defense and contention of the appellee that because of the eleemosynary character of its organization and work, it was not liable for the negligence of its agents and employees. The judgment appealed from is affirmed.—Affirmed.

MITCHELL, J., concurs in the result.

All the other JUSTICES concur.