CITY OF EVANSVILLE *v.* BLUE.

[No. 26,808.  Filed May 18, 1937.]

*Louis L. Roberts,* and *Leo Warren,* for appellant.

*Lockyear & Lockyear, McDonald & McDonald, R. Owen Williams,* for appellees.

*James E. Deery,* amicus curiae.

FANSLER, J.—Appellee brought this action for damages for loss of the services of her 11 year old son, who was drowned in a public swimming pool in a public park maintained by appellant.

The cause was tried by a jury, and there was a verdict and judgment for appellee in the sum of $1,000.

Error is assigned upon the overruling of a demurrer to the complaint and the overruling of a motion for a new trial.

The complaint alleges that appellant maintained a public swimming pool in one of its parks "wherein

children of all ages were invited to bathe under the care and custody of agents and servants of said City in charge of said pool"; that the water in said pool ranged in depth from a few inches deep to more than eight feet, and that it was a dangerous and unsafe place for children to bathe without the strictest supervision; that appellee "permitted her son, Roy Blue, age 11 years, to go to said swimming pool in the care of the employees of said City in charge of said pool, for the purpose of bathing"; that on said date the pool was crowded; that the boy entered said pool, "and on account of the negligence and carelessness of the servants and agents of the defendant in charge thereof, as hereinafter set out," he was drowned; that his body was found in about eight feet of water, in the bottom of the pool; "that the death of said child was caused solely and proximately by each of the acts of carelessness and negligence on the part of the defendant in this, to wit:

"1. By the guards in charge of said swimming pool negligently and carelessly failing and omitting to keep a proper lookout for said child while in said water.

"2. By negligently and carelessly allowing said child in the water at the time he was drowned.

"3. By negligently and carelessly permitting said child, who was not an expert swimmer, to dive off a high diving board into the deep water of said pool.

"4. In carelessly and negligently permitting said child, after having been in said pool for a long period of time, to again enter said pool and swim for a second period, and thereby become exhausted.

"5. In negligently and carelessly failing and omitting to paint the bottom of said pool white, so that anyone in charge of said pool would immediately see and ascertain where said child was in event he should fail to come to the top of the water in due time.

"6. In carelessly and negligently failing to adopt and

enforce reasonable rules for the safety of said child in said pool.

"7. In negligently permitting the pool to become over-crowded with children to the extent that it was impossible for the guards in charge thereof to see and care for each and every child in said pool, including this said deceased child.

"8. In carelessly and negligently failing and omitting to place in 'charge of said pool a sufficient number of guards to safeguard the welfare of the children lawfully using said pool and to prevent the children therein from drowning."

It appears from the evidence that the swimming pool is fifty feet wide and one hundred feet long. The depth of the water varies from one foot five inches to seven feet five or six inches. The bottom slopes gradually to the center depth of four feet, where a life rope separates the shallow water from the deep. For six feet more beyond the rope is a gradual slope, then a more abrupt drop to seven feet five inches, leaving ten or twelve feet of deep water in the pool. There is a diving board at the deep end of the pool. The bottom of the pool had been painted white, but in places where the paint had come off tar had been put on. There was no charge for swimming in the pool. There was a shelter house, containing a check room, shower room, and a place to change clothes. Boys were permitted to swim for periods of an hour, and were checked in and out through the clothing check room. The assistant recreational director testified that the facilities of the pool are available to the general public, and that lifeguards are kept there to look after the swimmers; that notices are published in the papers, but are not authorized; that there is an authorized announcement of the opening date in the newspapers. There is no evidence of any public announcement or representation as to the number of lifeguards maintained

at the pool, or is there any direct evidence of any representation by the city that lifeguards will be maintained. Appellee gave her consent to her son's going to the pool on the day in question. He told her he had been to the pool once before, which apparently she had not known. He went to the pool with some companions, put on a bathing suit, checked his clothes, and went into the pool. One witness testified that for a time the boy was near the rope in the center of the pool where the water was not over his head. At other times he was holding on to the side of the pool or the ladder in deep water, and once was seen to dive off the diving board into deep water. He was not a good swimmer. There was a rule that before a boy can qualify to swim in deep water he must pass a test, consisting of swimming the width of the pool three times under the supervision of the guard. The boy knew of this requirement, and had not passed his test. He had played around in the deep water. At the end of the first period, the boy and a companion got their clothes, but did not change. They gave their clothes to a friend to keep for them and got back into the water for the second period, without the knowledge of the attendants, and contrary to the rules. There were two expert swimmers, who were guards and swimming instructors, in attendance. There were about two hundred boys, of all sizes, at the pool during the second period. Some of the boys were on the bank, some on the diving board, some jumping in and climbing out of the water, and some lying on the concrete walk around the pool sunning themselves, and otherwise playing and having a good time. The two guards did not stay at the water all the time. They would turn around, talk to the boys, and, occasionally, one would go to the check room. The guards did not know Roy Blue. It does not appear that they knew whether or not be was a good swimmer. There seems to have been a guard on each

side of the pool during practically all of the time that the boy was in the water. One of the guards testified that, at the end of the first swimming period, the boys getting out of the pool stand in line to get their clothes and are checked out. The boys making up the new group check their clothes, receive a clothes check for them, take a shower, pass inspection, and step into the foot bath before going into the pool. The second-period swimmers are not checked in until all first-period swimmers are checked out. Each swimmer takes a shower before being inspected by the guard. It is easy for boys who have been in the pool during the first period to slip by the guard, since the guard might think the bathing suit was wet from the shower. As the boys are coming in, one of the guards goes to the deep end of the pool, and when the other guard is through checking boys he goes down to the deep end of the pool also. They patrol both the deep and the shallow ends of the pool to maintain order. To call attention to infraction of the rules, they blow a whistle, single out the guilty person, and require that he come to them. The guard could not say whether he reprimanded Roy Blue, because he did not know him. It is possible that he reprimanded some of the boys that afternoon, as it is seldom that some one does not break the rules during a period. He testified that he always sent those out of deep water whom he thought could not pass the swimming test, but that it is possible for a poor swimmer to make two or three good strokes and fool the guard into thinking he can swim; that a poor swimmer can jump off the bank or springboard and pull himself around the bank without showing that he is a poor swimmer; that a boy 11 years of age could jump from one corner of the pool to the other and it would be impossible to tell whether he could swim well enough to pass his test. A life-saving class started at about 4:15 o'clock, after the boys had been

cleared out of the pool. Instructions started at 4:30 o'clock. After the boys swam a little, diving instructions were started. During this practice, one of the boys found a body at the bottom of the pool. When he came up he told the guard, who thought he was joking, as the check room had checked out all right, with no checks missing. The boy went down again and came up with the same report. The water was not clear, and the bottom of the pool could not be seen in the deep end. It could be seen in the shallow end. The guard went down after the second report and brought up the body. Artificial respiration was started, but when a doctor came, about twenty or twenty-five minutes later, it was found that the boy was dead.

There is an entire lack of testimony as to the time or manner in which the boy met his death. When last seen he appears to have been jumping into the pool from the wall at the center of the pool.

There seems to have been an effort to charge negligence in the maintenance of the pool and also negligence on the part of the attendants. The only structural defect in the pool alleged is that it was not painted white on the bottom. But this is obviously not such a defect as would proximately cause the boy to drown, nor is it shown that the bottom of the pool could have been seen if painted white in its entirety. The water does not seem to have been clear enough to permit seeing the bottom of the pool. If it was negligence not to so maintain the pool that the bottom could be seen, in order to discover whether a boy's body had sunk to the bottom, the negligence might arise from not keeping the water clear. This is not alleged as negligence.

Upon the question as to whether a municipal corporation is liable in damages for a tort, either of mis-

feasance or nonfeasance, there is much confusion in the decisions. Even in jurisdictions where there is no liability for negligence in the discharge of a governmental function, there is liability for injury arising out of the maintenance of a public nuisance, and it has been held that municipal corporations are liable for injury to an employee on account of a breach of duty arising out of the relationship of master and servant. In *City of Kokomo* v. *Loy* (1916), 185 Ind. 18, 112 N. E. 994, this confusion is pointed out, and it is held that, this state having long adhered to the so-called New York rule, under which cities are liable for injuries due to failure to properly maintain streets, the same rule should apply to the maintenance of public parks, and a judgment against the city was sustained in a case in which an employee was injured, and in which there would have been liability under the master and servant relationship. So far as our examination of the cases discloses, the New York rule concerning streets, at least as it has been applied in this state, has affected cases arising out of structural defects only. We know of no case in which a city has been held liable for injury arising out of the use of the street, which was the result of the obvious dangers incident to such use. We know of no rule of law which imposes a duty upon the municipality to protect travelers upon the streets from the ordinary dangers of traffic involved in the use of the thoroughfares. It is a matter of common knowledge that police officers are frequently detailed to assist in the management of traffic and the protection of travelers at points where there is congestion upon the streets, and that policemen are stationed at intersections where school children of tender years are required to cross the streets, in order to assist them and protect them from the dangers incident to legitimate traffic

upon the street. But the authorities seem to clearly indicate that the municipality is not liable in damages for the failure of a policeman so stationed to efficiently and carefully superintend the passage of school children across the street, or for failure to supply and station a policeman at such crossing where one was usually stationed. It would seem therefore that if liability in respect to the maintenance and operation of parks is based upon their analogy to streets, the decisions go no further than to hold a city responsible for structural defects in the parks and their appurtenances and equipment. A swimming pool in a park, whether artificially constructed or a part of a natural pond, or lake, or stream, improved in its bathing facilities, is not per se a nuisance, and, unless there is some hidden or latent danger, the "turntable" or "attractive nuisance" doctrine does not apply. Such waters embody perils, but of a nature which must be deemed obvious to children who approach them for the purpose of bathing. Numerous cases upon the subject are collected in 20 R. C. L., p. 96. It would seem therefore that, if in such bodies of water there are no structural defects and no hidden or not to be suspected perils, the municipality is not bound to guard or police them any more than it is bound to guard or police the streets in order to protect against the ordinary dangers incident to their use.

In *City of Indianapolis* v. *Emmelman* (1886), 108 Ind. 530, 532, 533, 9 N. E. 155, it is said:

"In respect to cases such as we are considering, a learned author says: 'It is important to bear in mind, in actions for injuries to children, a very simple and fundamental fact, which in this class of cases is sometimes strangely lost sight of, viz., that no action arises without a breach of duty.' 2 Thomp. Neg., p. 1183, note.

"With this rule in view, and with the further concession that in dealing with cases which involve injuries

to children, courts and juries have some times strangely confounded legal obligation with sentiments that are independent of law, it must nevertheless be kept in mind that wherever an adult may be without incurring the imputation of being an intruder, a child may also go, free from the like imputation. The same circumstances which would justify a recovery by one who had reached years of discretion, and had sustained an injury from the act of another, while free from fault, would justify a recovery by an infant of such years as to be incapable of fault, provided its parents or guardian were also guilty of no neglect which could be imputed to the child. And so conversely, except when a child is seen in time so that injury to it might be avoided, persons who are lawfully using, or carrying on business on their own premises, are not liable for injuries to children, unless under the same circumstances they would have been liable to others who were equally free from fault."

And so, since the rule, that, if seen in time so that injury might be avoided, there is a duty to avoid, applies to adults as well as children, the rule of liability for negligence is the same whether the injured person is a child or an adult.

The practice of providing artificial pools, or of preparing bathing beaches in natural lakes or streams, so as to induce children of the community to come to them, may well have for one of its purposes the protection of children from the perils of natural streams and water courses where water is of fluctuating depth and where there is a possibility of unsuspected currents and dangers from sudden depths. There is some difficulty in concluding that, because a municipal corporation, in the public interest and for the protection of the young, furnishes them a place to swim, safer than a natural stream or lake, and furnishes some supervision or policing, and guards to protect against the danger of drowning, which

is inherent in swimming, it should be held responsible for unfortunate accidents because it has gone but part way and not furnished complete protection against drowning. It is well settled that, where a railroad has regularly maintained a watchman at a highway crossing, where it is not required by law to maintain one, it will be liable for the negligence of the watchman in failing to warn a traveler of approaching danger, and that where one who is acquainted with the custom of maintaining a watchman relies upon being warned, and the watchman has been removed, the railroad will be responsible if he is injured. But in such case the obligation voluntarily assumed is to warn against getting into a position of danger, while in the case of swimmers in a pool it is assumed that they will be in a position of danger, and guards are provided merely in an effort to protect those who are not competent swimmers from getting into water beyond their depth, through their own negligence or by accident, and to assist in rescuing those who, accidentally, or through their own negligence, or the negligence of others, come into difficulties.

Healthy boys of eleven years and younger must be deemed to know the perils of deep water, and it must be recognized that it is in the nature of boys to venture where it is dangerous. But it is none the less negligent for one who is not a good swimmer to venture into deep water, and, ordinarily, boys no more than adults may voluntarily and negligently put themselves in a position of known danger and charge others with responsibility for protecting them against their own voluntary acts. But there may be a duty by contract, express or implied, to protect children against their own voluntary negligent acts. Where there is such a duty, reasonable care to so protect must be exercised, and a failure to use such reasonable care may be actionable negligence. But even in such a case there is no in-

surance against injury, and it is not contended here that the city is an insurer. If the police department of the city had assigned two policemen to supervise the swimmers in the pool, and those policemen were expert swimmers, and donned swimming clothes, and undertook to supervise the swimmers so as to prevent drowning, it would seem, under the authorities, that the city would not be liable for any neglect on the part of the policemen. No logical basis is seen for a distinction because the guards happened to be paid out of the funds of the park department. In each case the city volunteers policing and supervision in an effort to protect from obvious and known dangers, just as it does in providing traffic policemen. If there is a difference in the duty which the city would owe, it must rest upon the insubstantial ground that the lifeguards in one case were paid out of the police fund and appointed by the police commissioners, while in the other they were paid out of the park fund and appointed by the park officers.

Just what is the measure of the duty of one who voluntarily undertakes to gratuitously supervise boys of 10 or 12 years on a swimming or fishing expedition does not clearly appear from the authorities, but it would seem that the city's liability here would be no greater than the liability of such a person, and at most the duty would seem to be to use reasonable care not to injure the boys, and to use reasonable care to protect them from their own acts of carelessness and negligence. But under such a rule liability must be based upon a negligent failure to use reasonable care and the injury must be proximately caused by such failure.

In *Rome* v. *London & Lancashire Indemnity Co. of America* (1936), (La. App.), 169 So. 132, 141, it is held

that the doctrine of *res ipsa loquitur* applies in the case of a drowning in a municipally-operated swimming pool where guards and life-savers are maintained. It is said in the opinion: "As an abstract proposition it would seem that the mere fact that a young boy, who could not swim, was drowned in a swimming pool is not such an unusual occurrence from which could be drawn an inference or presumption of negligence on the part of the pool proprietors. In the case at bar, however, this young boy was a paid patron of the swimming pool. For the price of 25 cents he was given a bathing privilege. The owners of the pool had the onus of protecting him from injury, and they recognized this obligation by employing life guards, whose duties were to protect his life and the lives of others who entered the pool." The soundness of the application of the doctrine to such a situation may well be doubted. It would seem not to be sustained by the reasoning in the cases dealing with the doctrine. The decision seems to be influenced by the contractual relationship which we do not have here. We have no hesitancy in holding that the doctrine does not apply here.

Counsel for appellee does not contend that appellant was an insurer of the safety of appellee's son, but contends that "the record presents a case in which a child was permitted to be drowned through the grossest negligence on the part of those placed by the city in charge of the operation of its pool." In order to recover, the burden was upon appellee to prove negligence. What, then, was the negligence? In what duty did appellant fail? There is no direct evidence that the boy was drowned. The fact seems to have been assumed, or it might be inferred from the statement of one of the guards, that this was the first drowning at the pool. Appellee's brief states that the boy was under water at the deep end of the pool an hour before he was discovered,

but we fail to find evidence establishing how long he was under the water, or when, or how, he was drowned. He may have gone under because of cramps, unobserved by his many companions and by the attendants. He may have struck his head on the bottom in diving. He may have been struck and disabled by another diver. He may have been pushed under or "ducked" by some other swimmer and held under too long. In what part of the pool he was drowned is not established, for, although he was found in the deep water, there is evidence that the agitation of the water might cause the body to move on the sloping bottom to the deeper end. The water was not sufficiently clear so that the bottom could be seen. Negligence is charged for failure to have the bottom painted white, but it appears to have been painted white except in spots where the paint had come off and tar had been applied. There is no evidence that a white boy could be seen against a white bottom any better than against a black bottom. It does not appear that the bottom, or objects lying on the bottom, could have been seen if it had been painted white. The fact that the water was not sufficiently clear that the bottom could be seen must have been apparent—it was not a concealed or hidden danger—so that if bathers ventured into water beyond their depth, or dived into such water, they did so with knowledge that they could not be seen by the lifeguards while near the bottom.

In *Bertalot* v. *Kinnare, Adm'r* (1897), 72 Ill. App. 52, 53, 54, the court had under consideration a case strikingly like the one at bar, except that the swimming pool was privately owned and operated as a business. A boy, 15 years of age, visited the pool, paid his admission, was last seen alive in the shallow end of the tank, and, fifteen minutes later, was discovered unconscious, and perhaps lifeless, at the bottom of the pool. After

reciting that the action was for damages based on negligence of the pool owner, the court said:

"The several counts of the declaration allege as the negligence complained of, first, failure of attendants to watch intestate while bathing; second, lack of railing at the north end of tank; third, permitting the room in which the tank was located to become over-crowded; fourth, failure to provide instructors to watch intestate, whereby failure to rescue resulted.

"It is doubtless the law that the proprietors of such an institution would be liable for injury to a patron, if such injury resulted from lack of ordinary care in providing for his safety, and without fault of the patron; but it is as surely not the law that such proprietor is in any sense an insurer of the safety of his patrons, nor would the death of a patron within his premises cast upon the proprietor the burden of excusing himself from any presumption of negligence. *Brotherton* v. *Manhattan B. I. Co.*, 48 Neb. 567.

"It was incumbent upon defendant in error, as plaintiff in the trial court, to sustain his declaration with evidence, and to establish the averments of some one of its counts. The question here presented is simply whether the record shows evidence which would warrant the jury in finding that there was such lack of ordinary care as is alleged, and that it was the proximate cause of the death of the intestate.

"Defendant in error presented no evidence to show just how the lad came to his death, except that some ten or fifteen minutes after he was seen alive in a place of safety, he was found unconscious, and, it may be, already dead, at the bottom of the swimming tank. . . .

"The verdict for defendant in error was bad, because unsupported by any evidence whatever as to how the intestate happened to meet the disaster which resulted in his death, and what negligence, if any there was, con-

tributed thereto, or was the proximate cause thereof. The verdicts, general and special, could have been based upon nothing but guess-work."

In *Crone* v. *City of El Cajon et al.* (1933), 133 Cal. App. 624, 630, 24 Pac. (2d) 846, 848, 849, another case strikingly similar to the one at bar, it is said:

"The evidence must show some casual connection between the death of Emmitt and the fact that but one lifeguard was stationed at the pool. In order to permit a recovery the failure to have more than one lifeguard must have been the proximate cause of the death. In this we disregard any question of contributory negligence.

"The lifeguard was probably around the pool at the time Emmitt disappeared beneath the water. Emmitt's own brother was swimming there. A number of youths, all expert swimmers, were in the pool and over the spot where the body was found. None of them, nor any of the many bathers in the pool, saw Emmitt sink or had any idea he was misisng until about the time his body was found. The city of El Cajon was not required to insure the safety of the bathers in its pool, nor can a lifeguard guarantee that no bather will drown in the water he is patrolling. The city was only required to furnish a pool that was not in a dangerous or defective condition. Would two lifeguards have prevented the tragedy? If ten lifeguards had been employed would any one of them have been more likely to have seen the boy sink into the water than the considerable number of bathers who were swimming and diving near the spot where he must have disappeared? Under the facts before us we cannot conclude that the failure to have more than one lifeguard was the proximate cause of Emmitt's drowning."

Here also we have a pool full of swimmers. Many cities maintain public bathing beaches in rivers and

lakes where the bottom is not white and where the water is not so clear that bottom can be seen wherever bathers may go. But this does not amount to actionable negligence. Since the rule *res ipsa loquitur* does not apply, it is not necessary to determine the measure of the city's duty. There is no evidence showing the proximate cause of the death of the boy, and therefore no evidence upon which it could have been determined that his death was proximately caused by the negligence of the city or its servants, even though the city had a duty to use reasonable care to protect him from his own negligence. The motion for a new trial should have been sustained.

Appellee criticizes the manner in which appellant's brief is prepared, but most of the criticism is highly technical. The brief is within the rules.

In view of what has been said, it is not necessary to consider the instructions.

Appellee contends that each instruction tendered and requested must be signed. It is the long-established practice to sign the request for instructions to which the tendered instructions are attached, and, where the instructions are numbered and connected, to sign the last instruction at the bottom. This is sufficient.

The motion to dismiss is overruled on authority of *City of Michigan City et al.* v. *State ex rel. Seidler* (1937), 211 Ind. 586, 5 N. E. (2d) 968.

Judgment reversed, with instructions to sustain appellant's motion for a new trial.