[Civ. No. 20356.  Second Dist., Div. Three.  Mar. 3, 1955.]

WILLIAM HENRY WILLIAMS, Appellant, v. CITY OF ALHAMBRA et al., Respondents.

Huston T. Carlyle for Appellant.

Charles H. Lynch for Respondents.

WOOD (Parker), J.—Appeal from judgment of nonsuit in an action for damages for personal injuries sustained as the result of alleged negligence of defendants.

Plaintiff, 56 years of age, was an applicant for the position of park caretaker in Alhambra. After receiving a notice to appear at the city hall, he went there on November 29, 1951, and talked with defendant Mr. Lapham, who was the personnel director and administrative assistant to the city manager. Mr. Lapham told him and six or seven other applicants that they would be required to take a physical strength test. It may be stated generally that in taking the test an applicant pulls against the tension of a spring scale that registers the strength exerted. The apparatus, as shown in a photograph (Exhibit 2), may be described as follows: a board, which is about 2½ feet long and 1 foot wide, lies flat on the floor or pavement and is the base of the apparatus; one end of a chain is attached to the middle of the board, and the other end is attached to a spring scale on which there is a dial that reg-

isters the strength exerted; the top of the scale is attached, by means of a hook and a ring, to the middle of a handle bar which is about 1½ feet long. The distance from the baseboard to the handle bar, when the connections between them (chain, scale and hook) are fully extended, is about 2½ feet. The person taking the test stands on the baseboard with one foot on each side of the chain, takes the bar in his hands, and pulls upward. The pulling rotates a pointer on the dial of the scale which shows the strength exerted. The applicant who has the highest score receives the highest rating in the examination. If an applicant fails in the physical strength test, his name is not placed on the eligible list. On the day of the examination herein, applicants for the position of park caretaker were assigned to take the strength test in alphabetical order, and plaintiff was the last one on the list. No medical examination was given to any of the applicants prior to the strength test. The first phase of the test was a back-strength test. Then the applicants were given instructions by Mr. Lapham regarding the second phase of the test which, according to the testimony of appellant, was a leg-and-arm-strength test. They were instructed to stand on the board with their knees flexed and, while holding the bar in their hands, to place it on their thighs. The apparatus was then adjusted to the size of the applicant by adjusting the chain. The applicant was instructed to raise the bar with his arms and to exert pressure with the muscles of his legs and thighs, and to give it "all you got." After the other applicants had taken the second phase of the test, appellant took his position on the baseboard and took the bar in his hands. Mr. Lapham then told him to be sure that it was in "the most comfortable place that you can lift with." Appellant began to exert himself to his full capacity because some of the records made by other applicants in the first test were higher than appellant's record and he wanted to make as good a showing as possible. He exerted himself with all of his ability and at that time he felt a severe pain in his back and he fell to the pavement. He sustained an injury to his back and was taken to a hospital. While he was lying on the pavement he asked Mr. Lapham if he (appellant) had lifted anything and Mr. Lapham replied "you sure did, 580 pounds." He testified that prior to taking the examination he was in excellent health. He stated in his application for the position that his health was good and he had no physical defects.

Mr. Lapham, called as a witness by plaintiff under section

2055 of the Code of Civil Procedure, testified that he had no medical training or experience. Before he was employed by the defendant city the civil service board had issued a bulletin giving instructions as to how the apparatus was to be operated. He followed those instructions in giving the tests. Prior to giving the tests here involved he had given the same tests for the position of park caretaker three or four times, and he had also given the tests to hundreds of applicants for other positions. There was no age restriction regarding the examination. The second phase of the test was a leg-strength test, and applicants for park caretaker were instructed that the pressure was to be exerted with the leg and thigh muscles. The pressure which could be exerted on the apparatus was in excess of that which a person could normally exert. In Alhambra a park caretaker is required to do the work of a groundman and gardener, to do general clean-up and maintenance work in the park and park buildings and to act as a construction helper. He thought that a park caretaker in Alhambra would not lift anything heavier than 100 pounds.

In response to questions by counsel for appellant, Mr. Lapham demonstrated how the apparatus, which was in the courtroom, was operated. He demonstrated the manner in which the chain was adjusted (depending upon the height of each applicant), and how pulling the bar causes the scale to register the strength which was exerted. He then demonstrated the two tests which the applicants took on the day appellant was injured.

Appellant contends in substance that the apparatus, used in giving the physical strength test, constituted a dangerous or defective condition of which defendants had knowledge and which they failed to remedy within a reasonable time after acquiring such knowledge. Section 53051 of the Government Code imposes liability upon a city for injury to persons ''resulting from the dangerous or defective condition of public property if the legislative body, board, or person authorized to remedy the condition: (a) Had knowledge or notice of the defective or dangerous condition (b) For a reasonable time after acquiring knowledge or receiving notice, failed to remedy the condition or to take action reasonably necessary to protect the public against the condition.'' Appellant argues that the evidence would support a finding that the apparatus was dangerous ''because it provided for a pull and exertion by the applicant'' beyond the requirements of the position of park caretaker and beyond human strength. No

specified amount of pulling or pressure was required to be exerted. The test was competitive, and the purpose of it was to determine the relative strength of the individual applicants. The fact that the apparatus would register pressure or exertion greater than that which normally could be exerted by persons, or greater than that which was necessary to qualify an applicant for the position of park caretaker, would not justify a conclusion that the apparatus was dangerous or defective. Appellant also argues that a dangerous condition was created in that: the test was given without a medical examination of the applicants, and irrespective of their age or health; the applicants were told to "give it all you got"; and the test was given under the supervision of a person having no medical training. As above shown, Mr. Lapham had previously given the same test, with the apparatus here involved, to hundreds of applicants for various positions with the defendant city. On the day of the examination herein, six or seven other applicants for the position of park caretaker had completed the last phase of the strength test before the appellant took it. It does not appear that any of those applicants sustained an injury while taking the tests. There is no evidence herein that the apparatus used in the tests was dangerous or defective. It cannot be said that a dangerous or defective condition existed within the meaning of section 53051 of the Government Code.

█ Appellant contends further that a city in operating its public parks is acting in a proprietary capacity, and therefore the defendant city is liable for negligence in conducting the examination irrespective of whether there was a dangerous condition. Plaintiff was applying for a position as park caretaker and presumably, if he had been employed, he would have been available for assignment to duty in any of the parks in Alhambra. There is no evidence herein from which it can be concluded that a certain park or any park in Alhambra was operated by that city in a proprietary capacity. Ordinarily, public parks are operated by municipalities as a part of their governmental functions. (See *McKinney* v. *City and County of San Francisco,* 109 Cal.App.2d 844, 845-846 [241 P.2d 1060] ; *Meyer* v. *San Francisco,* 9 Cal.App.2d 361, 363 [49 P.2d 893] ; *Crone* v. *City of El Cajon,* 133 Cal.App. 624, 629 [24 P.2d 846] ; *Kellar* v. *City of Los Angeles,* 179 Cal. 605, 609 [178 P. 505].) In the McKinney case it was held that the defendant city in operating a zoo as part of its public park and playground facilities "was engaged in a governmental

capacity." In the Meyer case it was held that the defendant city in operating a miniature train in a public park was acting in a governmental capacity. In the Crone case it was held that the defendant city in operating a swimming pool in a public park "was exercising a governmental function and acting in a governmental capacity." In the Kellar case it was held that the defendant city in maintaining a summer camp for children was acting in a governmental capacity, and it was stated therein (p. 609) that playgrounds and recreation centers maintained by a city for the general use of children, "where so conducted as to partake in no degree of the nature of a private business enterprise, do not substantially differ from a public park," insofar as the question of exercising governmental power is concerned. In the present case it must be concluded that the public parks in the City of Alhambra were operated by that city in the exercise of its governmental functions.

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.